**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

| | |
|---|---|
| MONROE COUNTY BOARD OF COMMISSIONERS 100 W. Kirkwood Avenue, Room 322 Bloomington, IN 47404 )<br><br>INDIANA FOREST ALLIANCE 615 N. Alabama Street, Suite A, Indianapolis, IN 46204 )<br><br>HOOSIER ENVIRONMENTAL COUNCIL 3951 N. Meridian Street, Ste. 100 Indianapolis, IN 46208 )<br><br>FRIENDS OF LAKE MONROE 1275 S. Longwood Drive Bloomington, IN 47401 )<br><br>*Plaintiffs*, )<br><br>v. )<br><br>UNITED STATES FOREST SERVICE Sidney R. Yates Federal Building 201 14th Street SW Washington, DC 20227 )<br><br>MICHAEL CHAVEAS, FOREST SUPERVISOR, Hoosier National Forest Supervisor's Office 811 Constitution Avenue Bedford, IN 47421 )<br><br>CHRISTOPHER THORNTON, DISTRICT RANGER, Hoosier National Forest Brownstown District Office 811 Constitution Avenue Bedford, IN 47421 )<br><br>*Defendants*. ) | Civ. No. 4:23-cv-00012 |

## INTRODUCTION

1.      This case challenges the United States Forest Service's ("Forest Service")
Houston South Vegetation Management and Restoration Project (the "Project"), which consists
of commercial logging, road building and trail improvements, herbicide application, and
prescribed burning in the Hoosier National Forest, which is the only National Forest within the
state of Indiana. The Project will take place within the Lake Monroe watershed, which already
suffers from highly degraded water quality due to activities such as logging and agriculture. The
watershed ultimately drains into Lake Monroe, the largest lake in Indiana and the sole source of
drinking water for over 145,000 people. Many of the Project activities will be carried out on
steep slopes with highly erodible soils, increasing the risk of streambank erosion and pollution of
the already impaired watershed with consequent risks to drinking water, public health, safety,
recreation, and the ecosystem. The Project will adversely impact Lake Monroe and its tributaries,
and will irreparably harm Plaintiffs and their interests in the watershed and its environmental
resources.

2.      Chief Judge Pratt of this Court previously determined that the Forest Service
violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347, by failing
to take the legally required "hard look" at the direct, indirect, and cumulative impacts of the
Project on Lake Monroe in its final Environmental Assessment ("EA"), and had therefore failed
to make a convincing case that the Project's impacts on Lake Monroe were insignificant and
could avoid scrutiny in a more rigorous Environmental Impact Statement ("EIS"). This Court
therefore remanded the EA to the agency for it to conduct such an analysis in the first instance.
However, far from conducting a NEPA-compliant environmental evaluation, the Forest Service
instead issued a Supplemental Information Report ("SIR") that purported to comply with this

1

Court's order by "explain[ing] why the impacts to Lake Monroe would not be significant." However, it is well-established that an SIR is not a NEPA document and thus cannot substitute for an EA or an EIS; rather, its appropriate use is to evaluate whether new information merits supplementation of a prior NEPA analysis. Accordingly, an SIR cannot cure a NEPA violation where the agency failed to take a "hard look" at the environmental impacts of an action in the first place. The Forest Service's attempt to do so here violates NEPA and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

3.      As they had during the Forest Service's initial decisionmaking process for this Project, Plaintiffs again explained in response to the draft SIR that this Project would have highly significant adverse impacts on water quality and other important environmental resources in the watershed and urged the Forest Service to fully evaluate the impacts of the Project in an EIS. To that end, Plaintiffs provided extremely detailed critiques of the Forest Service's assumptions and conclusory assertions in the SIR (as well as the prior EA and Finding of No Significant Impact ("FONSI")). Plaintiffs also compiled peer-reviewed studies containing new information not considered by the Forest Service in its original decisionmaking process. However, the Forest Service refused to engage with Plaintiffs' substantive comments and instead treated the SIR process as a make-work exercise to justify a decision already made, in violation of NEPA and the APA. The agency even failed to respond to the highly relevant, technical comments from Plaintiff Friends of Lake Monroe ("FLM")—i.e., the organization that issued the Lake Monroe Watershed Management Plan ("WMP"), which the Forest Service relies upon to insist that the Project's impacts will not be significant. For this reason, although FLM was not a litigant in the previous lawsuit, FLM joins this case as a co-plaintiff to ensure that the Forest Service may not

2

improperly rely on FLM's Lake Monroe WMP to downplay the highly significant impacts of the Project.

4.       By refusing to take a "hard look" at the highly significant impacts that the Project will have on Lake Monroe and its tributaries, by failing to respond to Plaintiffs' substantive comments, and by refusing to prepare an EIS to consider those significant environmental impacts, the Forest Service violated NEPA and the APA.

## JURISDICTION

5.       This case arises under the judicial review provisions of the APA, 5 U.S.C. §§ 704, 706. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

6.       Pursuant to 28 U.S.C. § 1391, venue is proper in this Court and Division because the Project at issue will take place in Jackson County and Lawrence County, Indiana.

## PARTIES

7.       Plaintiff Monroe County Board of Commissioners is a local governing body, elected pursuant to Indiana Code 36-2-2 et seq., serving as the Executive and Legislative branches of Monroe County Government, which represents the interests of the residents of Monroe County, Indiana. The Board of Commissioners' responsibilities include advocating on behalf of Monroe County residents regarding federal projects that may impact residents' health, safety, and welfare. The Board of Commissioners submitted comments on the draft EA for the Project and filed timely objections to the Forest Service's decision. The Board's comments and objections identified specific adverse environmental impacts from the Project, including impacts to Lake Monroe and the drinking water it provides to local residents, and repeatedly requested that the Forest Service consider specific alternatives that would better protect the environment and the interests of the citizens of Monroe County. Monroe County was a plaintiff in the

previous lawsuit in which this Court remanded the Project for further environmental analysis under NEPA regarding impacts to Lake Monroe.

8. During the SIR process, Monroe County requested an extension of the 30-day comment period to provide sufficient time to fully review the draft SIR's cited references; obtain input from hydrologists, county staff, and other experts; and compile additional peer-reviewed studies that undermine the draft SIR's assumptions and conclusory assertions. However, the Forest Service denied Plaintiffs' extension request, insisting that 30 days was sufficient to review the "short . . . focused document." Due to the agency's denial of the extension request, Monroe County notified the Forest Service that the denial "prevented the County from formulating its own response to the SIR within the thirty day comment period."

9. The Forest Service's decision to undertake the Project harms the Monroe County Board of Commissioners' interests in ensuring that all residents of Monroe County have access to clean, safe drinking water and opportunities for high-quality outdoor recreation in the Lake Monroe watershed. The Board of Commissioners repeatedly raised these issues in comments and objections to the Forest Service's initial decisionmaking process for the Project, and requested that the Forest Service consider alternatives to the Project that would better protect the environment and the interests of the Monroe County residents whom the Board represents and for whom the Commission advocates. The Board of Commissioners also signed onto Plaintiff Indiana Forest Alliance's ("IFA") comments on the draft SIR, which explained that serious factual errors and methodological flaws undermined the agency's analysis of the Project's impacts to Lake Monroe, and requested that the agency prepare an EIS to fully evaluate those effects. However, the Forest Service again denied that the impacts to Lake Monroe, or to the

interests of the residents of Monroe County, were significant; likewise, the Forest Service refused to supplement its original analysis with either an EA or an EIS as NEPA requires.

10.    Plaintiff IFA is a non-profit organization dedicated to the long-term health and well-being of Indiana's native forests. IFA provides accurate information to the people of Indiana to involve them in efforts to protect Indiana's forests and works to ensure their opportunities for input into decisionmaking that affects forests, including decisionmaking by the Forest Service. IFA speaks out for the native animals, plants, and other creatures who survive in Indiana's forests and cannot speak for themselves. IFA's mission is to preserve and restore Indiana's native hardwood forest ecosystem for the enjoyment of all.

11.    Plaintiff IFA has submitted detailed comments to the Forest Service regarding the Project at every opportunity, including on the draft SIR. IFA's detailed comments on the draft SIR explained that the Project will have highly significant adverse impacts on Lake Monroe and requested that the Forest Service fully evaluate those impacts in an EIS. Plaintiff IFA also submitted numerous scientific studies that directly undermine the Forest Service's assumptions and assertions in the draft SIR that purport to support the agency's conclusion that the impacts to Lake Monroe will be insignificant.

12.    The Forest Service's decision to undertake the Project harms the aesthetic, recreational, and professional interests of IFA and its members. IFA members live and work in the area that uses Lake Monroe as a source of drinking water. As detailed in IFA's comments on the draft SIR, the Project will have significant adverse effects on water quality in Lake Monroe and its tributaries, which in turn harms IFA members' interests in access to clean, safe drinking water, as well as their aesthetic interests in a clean and healthy reservoir and broader watershed for recreation. Indeed, IFA members regularly use the Project area for hiking, birdwatching,

camping, and other similar outdoor activities, and they use Lake Monroe for water-based recreational opportunities. By contributing to the pollution of the watershed and further degrading water quality, the Project will have significant adverse impacts on the ability of IFA's members to engage in high-quality outdoor recreational opportunities in and around the watershed. Additionally, trail closures and the conversion of trails into logging roads will adversely impact IFA members' aesthetic and recreational interests in hiking, birdwatching, and camping in the Project area.

13.     Plaintiff Hoosier Environmental Council ("HEC") is a non-profit organization whose mission is to make Indiana a better place to live, breathe, work, and play. HEC works toward these goals principally through education and advocacy. For example, HEC works to educate the public about the activities of federal land managers such as the Forest Service and how those activities affect the natural resources that the citizens of Indiana enjoy. Likewise, HEC engages in advocacy efforts that include advocating for federal land managers such as the Forest Service to take actions that meaningfully protect and restore the environment in Indiana.

14.     Plaintiff HEC submitted detailed comments to the Forest Service regarding the Project at every opportunity during the initial decisionmaking process, as well as on the draft SIR. Plaintiff HEC's comments on the draft EA noted that the Forest Service's own goals for the Hoosier National Forest include protecting and restoring watershed health, and encouraged the agency to consider alternatives that would more effectively accomplish this goal, for example by siting projects outside of the watersheds of municipal drinking water supplies or by considering alternative project tools that may better protect watershed resources. HEC's comments also drew attention to specific deficiencies in the Forest Service's environmental analysis, such as its refusal to conduct a comprehensive analysis of the Project's cumulative environmental impacts.

Likewise, HEC's draft SIR comments pointed out the glaring legal, factual, and scientific defects inherent in the agency's draft SIR.

15.    The Forest Service's decision to undertake the Project harms the aesthetic, recreational, and professional interests of HEC and its members. HEC members regularly use the Project area for hiking, birdwatching, camping, and other similar outdoor activities, but the Project will have significant adverse impacts on the ability of HEC's members to engage in high-quality outdoor recreational opportunities. For example, trail closures and the conversion of trails into logging roads will adversely impact HEC members' aesthetic and recreational interests in hiking and camping in the Project area.

16.    Plaintiff FLM is a non-profit, science-driven organization, which serves as the only organization dedicated to protecting and enhancing Lake Monroe and its watershed, including by supporting water quality, pollution reduction, and sustainable recreation. FLM works to accomplish this mission by promoting data collection, the development and implementation of science-based policy, and collaboration between local, state, and federal government entities, businesses, and private parties. FLM received a grant from the state of Indiana's Department of Environmental Management and the United States Environmental Protection Agency to develop the Lake Monroe WMP. The two-year project studied problems facing the watershed, quantified their magnitude, identified their source(s), and created a strategic action plan for addressing them. FLM also worked to build a coalition of agencies, organizations, and individuals committed to implementing the WMP and developing initiatives focused on public engagement and education. FLM completed the WMP in January 2022, only two months prior to this Court's summary judgment ruling. If anything, the WMP highlighted the substantial challenges facing Lake Monroe and its broader watershed, and counsels in favor

of taking a cautious approach to actions—such as the Project—that will foreseeably contribute new forms of sediment and other pollutants into the already degraded Lake Monroe watershed.

17.    FLM submitted detailed science-based comments to the Forest Service regarding the draft SIR. In particular, FLM's comments criticized the Forest Service's misplaced reliance on the WMP and disputed the agency's characterizations of the Project's direct, indirect, and cumulative effects on water quality in the Lake Monroe watershed. FLM's comments also pointed to specific, serious flaws in the Forest Service's environmental analysis, and requested that the Forest Service fully evaluate the Project's significant effects on Lake Monroe and its tributaries.

18.    The Forest Service's decision to undertake the Project harms the aesthetic, recreational, and professional interests of FLM and its members. FLM members live and work in Bloomington and counties within the Lake Monroe watershed, which will be adversely affected by the Project. FLM members thus have interests in access to clean and safe drinking water from Lake Monroe. These interests will be harmed by the Project's serious adverse impacts on water quality within the watershed. FLM members' also have aesthetic, recreational, professional, and scientific interests in the watershed and its surrounding areas. For example, FLM members use the Project area for outdoor activities, including hiking, camping, and birdwatching, as well as for professional opportunities, including studying water quality and wildlife that inhabit the watershed. The Project will have significant adverse impacts on the ability of FLM's members to engage in high-quality outdoor recreational and professional opportunities. For example, closures due to logging and burning activities will adversely impact FLM members' aesthetic and recreational interests in hiking and camping in the Project area.

19.     A court order vacating the Forest Service's decision to undertake the Project until and unless the Forest Service conducts a new analysis that complies with NEPA would redress Plaintiffs' injuries, because such a ruling would require the Forest Service to undertake a new analysis that may yield a decision that is more protective of the environment and of Plaintiffs' interests in the environment.

20.     Defendant Forest Service is a federal agency within the United States Department of Agriculture that is responsible for managing the nation's National Forests, including the Hoosier National Forest. The Forest Service is ultimately responsible for the actions challenged in this Complaint.

21.     Defendant Michael Chaveas is the Forest Supervisor for the Hoosier National Forest. As the Forest Supervisor, Mr. Chaveas is responsible for the actions challenged in this Complaint. Mr. Chaveas is sued in his official capacity.

22.     Defendant Christopher Thornton is the District Ranger for the Brownstown Ranger District and the Tell City Ranger District within the Hoosier National Forest. Mr. Thornton signed the final SIR for the Project and is thus responsible for the actions challenged in this complaint. Mr. Thornton is sued in his official capacity.

## FACTS GIVING RISE TO PLAINTIFFS' COMPLAINT

## I.     STATUTORY AND REGULATORY FRAMEWORK

### A.   The National Environmental Policy Act

23.     NEPA is the nation's "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Its purposes are to "help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment," and to "insure that environmental information is available to public

officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b), (c).

24.    The Council on Environmental Quality ("CEQ")—an agency within the Executive Office of the President—has promulgated regulations implementing NEPA, *see* 40 C.F.R. §§ 1500–1508, which are "binding on all federal agencies." *Id.* § 1500.3.

25.    To accomplish its underlying goals, NEPA requires federal agencies to prepare a "detailed statement"—i.e., an EIS—for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An EIS must describe (1) "the environmental impact of the proposed action," (2) "the adverse environmental effects which cannot be avoided," and (3) "alternatives to the proposed action." 42 U.S.C. § 4332(C)(i)–(iii). By definition, the environmental impacts that require analysis under NEPA are far broader than just those affecting the ecosystem itself; such effects include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health" impacts. 40 C.F.R. § 1508.8(b).

26.    Each EIS must consider the underlying federal "purpose and need" for the proposed action, and "rigorously explore and objectively evaluate" the environmental impacts of "all reasonable alternatives" to the proposed action. 40 C.F.R. §§ 1502.13, .14 (emphasis added). NEPA further provides that agencies "shall . . . study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E). CEQ has deemed the alternatives analysis "the heart" of the NEPA process because it "present[s] the environmental impacts of the proposal and the alternatives in comparative form, thus sharply

defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

27.    NEPA requires that, in evaluating the alternatives of a proposed action, agencies take a "hard look" at the effects of the proposed action as compared to all reasonable alternatives. *See* 40 C.F.R. §§ 1502.1, .16. Agencies must assess the direct, indirect, and cumulative impacts of the proposed action, including adverse environmental effects that cannot be avoided. *Id*. § 1508.25. Direct effects are those "caused by the action and occur at the same time and place," while indirect effects are those "caused by the action" that occur "later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8. Cumulative impacts are those that result from the "incremental impact[s]" of the proposed action when added to the impacts of other past, present, and reasonably foreseeable future actions, whether undertaken by other federal agencies or private third parties. *Id.* § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

28.    To aid in determining whether an EIS is required, an agency may prepare an EA that analyzes the environmental impacts of the proposed action as well as its alternatives. 40 C.F.R. §§ 1501.4(c), 1508.9. Although less rigorous than an EIS, an EA must "include brief discussions" analyzing direct, indirect, and cumulative impacts of the proposed action, as well as alternatives to the action. *Id.* § 1508.9; *see also* 42 U.S.C. § 4332(E) (requiring agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources").

29.    In determining whether an EIS is required, an agency must consider whether the proposed action has a "significant" effect on the human environment. 40 C.F.R. § 1508.27. The "significance" determination is based on numerous factors, including "[t]he degree to which the proposed action affects public health and safety," the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas," "the degree to which the effects on the quality of the human environment are likely to be highly controversial," "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," "[t]he degree to which the action may adversely affect an endangered or threatened species," and "[w]hether the action threatens a violation of Federal, State, or local law." Id. § 1508.27(b). An action is also significant if it "is related to other actions with individually insignificant but cumulatively significant impacts." *Id.* § 1508.27(b)(7). "Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment" and "cannot be avoided by terming an action temporary or by breaking it down into small component parts." *Id.* The presence of any one of these factors requires the preparation of an EIS.

30.    If, in the course of preparing the EA, the agency determines that an EIS is not required, it must issue a FONSI explaining the reasons why the agency has determined that its proposed action "will not have a significant impact" on the environment. 40 C.F.R. § 1508.13.

31.    Public participation in agency decisionmaking, including disclosure of information concerning an agency's proposed action, its impacts, and public input into the development of reasonable alternatives to the action, is central to NEPA's statutory and regulatory scheme, regardless of whether an agency prepares an EIS or an EA. The CEQ

regulations require that federal agencies "shall to the fullest extent possible . . . encourage and facilitate public involvement in decisions which affect the quality of the human environment," and require agencies to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. §§ 1500.2, 1506.6(a). Thus, "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b). In short, "[a]ccurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.*

## II.    FACTUAL BACKGROUND

### A.    The Hoosier National Forest

32.    The Hoosier National Forest, which the Forest Service describes as "Indiana's National Treasure," is the only national forest in the State of Indiana.[1] The Forest provides habitat for numerous wildlife species, including species listed as threatened or endangered under the ESA, as well as species recognized as rare or vulnerable by the State of Indiana or by the Forest Service itself. The Forest provides some of the most popular opportunities in the state of Indiana for outdoor recreation such as hiking and camping.

33.    The Hoosier National Forest was established in 1935. According to the Forest Service's 2006 Forest Plan for the Hoosier National Forest, "[t]he driving force for establishing the Hoosier was to stabilize and restore eroding lands and protect watersheds from sediment." Widespread deforestation in Indiana around the turn of the 20th century led to extensive damage to soils, watersheds, and waterways, and the Hoosier National Forest was established in part to

---

[1] *See* U.S. Forest Serv., *Hoosier National Forest – Indiana's National Treasure*, https://www.youtube.com/watch?v=8qWerRFJWjc (last accessed January 9, 2023).

halt and reverse this environmental damage. The Hoosier National Forest has pursued that goal by acquiring large parcels of contiguous land and by promoting reforestation in order to retain soils, prevent adverse impacts to waterways, and provide for a healthy ecosystem. For example, in order to protect and restore soil, and to prevent sediment from flowing into local watersheds, the Forest Service planted various species of trees, including pines, on slopes that otherwise were prone to erosion, including slopes within the Project area.

34.    The 2006 Forest Plan aims to continue "the historic mission of the Hoosier for watershed protection and restoration." The Forest Plan includes a "goal," or an "overall purpose of the Forest," to "Maintain and Restore Watershed Health." The Forest Plan notes that "[t]his goal emphasizes collaborative stewardship of watersheds" and avers that "[t]he Forest will contribute to the restoration of water quality and soil productivity to improve the condition of those watersheds impacted by past land use practices." The Plan further states that the Forest Service will "[g]ive priority to stabilizing areas discharging soil into watercourses, especially those that affect the watershed of municipal or recreational reservoirs."

**B.    Water Resources Within the Area of the Project Area**

35.    The Hoosier National Forest abuts Lake Monroe, which is a 10,750-acre reservoir created in 1964 by damning Salt Creek. The largest lake in Indiana, Lake Monroe serves as the *sole source* of drinking water for more than 145,000 people in Bloomington, Indiana and Indiana University, and other surrounding communities. In addition to thus being a critical environmental resource, Lake Monroe is also an important recreational and economic resource, attracting roughly 1.5 million visitors each year and contributing significantly to the local economy.

36.    Lake Monroe is fed by three main tributaries: the North, Middle, and South Forks of Salt Creek. The entire Lake Monroe watershed spans 441 square miles and can be subdivided

into four major sub-watersheds: the South Fork of Salt Creek sub-watershed; the North Fork of Salt Creek sub-watershed; the Middle Fork of Salt Creek sub-watershed; and the Lake Monroe Basin sub-watershed.

37.     Lake Monroe and its tributaries suffer from significant water quality issues caused by pollution from nearby land uses, including nutrient overloading from agricultural and septic runoff and sedimentation from agricultural and forestry management activities in the watershed. Sediment in particular is a major concern for the watershed. Sediment carries the nutrients phosphorous and nitrogen as it moves through the watershed. These nutrients, in turn, promote eutrophic conditions and the incidence of harmful algal blooms, impairing the quality and safety of drinking water and diminishing recreational use. Sediments are accumulating in Lake Monroe, entering the lake through its tributaries. A significant source of this sediment is soil erosion. Approximately 76% of the Lake Monroe watershed is considered highly erodible due to steep slopes and soil type, and erosion has been documented at 86% of observed stream sites within the watershed.

38.     The pollution to Lake Monroe and its tributaries from these and other sources has resulted in a significant degradation of water quality. Indeed, Lake Monroe has been designated as "impaired" under the Clean Water Act due to taste and odor, algal blooms, and mercury in fish. Relevant here, the South Fork of Salt Creek and one of its unnamed tributaries have also been designated as "impaired" under the Clean Water Act due to "low dissolved oxygen and low biological communities." The South Fork of Salt Creek also contributes the largest amount of nitrogen to Lake Monroe of any of its tributaries.

39.     The sedimentation and pollution of Lake Monroe and its tributaries particularly increase the incidence of harmful algal blooms, which typically occur in warm summer months.

Each year for the past eight years, harmful algal blooms in Lake Monroe have led the state of Indiana's Department of Environmental Management to issue warnings to the public that exposure to algal blooms can result in rashes, skin or eye irritation, nausea, stomach aces, and neurological symptoms, and advising members of the public that they should contact a physician if they experience any symptoms after recreational activities in Lake Monroe. These recreational advisories also note that the algal blooms can be poisonous to animals and that pets should not swim or drink where algae is present. Sedimentation and algal blooms also substantially increase the cost of treating the water of Lake Monroe for use as drinking water and have caused an increase in toxic disinfectant byproducts in the drinking water, which further impairs public health and safety. In the past two summers, disinfectant byproducts caused significant taste and odor problems in the City of Bloomington drinking water. Forestry activities such as timber harvesting contribute sedimentation and nutrient runoff that exacerbate the degraded conditions in Lake Monroe and its tributaries.

40.     The Project is located within the South Fork of Salt Creek sub-watershed, which is part of the larger Lake Monroe watershed. Thus, all streams within the Project area ultimately drain into Lake Monroe. The Project occupies roughly 35.5% of the South Fork of Salt Creek sub-watershed. The South Fork of Salt Creek watershed in turn constitutes 102.4 square miles of the total 432 square miles of Lake Monroe's drainage area (or roughly 25%), and the Forest Service has found that the South Fork of Salt Creek contributes roughly 30% of the water that flows into Lake Monroe.

41.     The Forest Service is the single largest landowner in the Lake Monroe watershed. The Hoosier National Forest represents roughly 20% of the total acreage of the watershed, and constitutes over 40% of the South Fork of Salt Creek sub-watershed. National Forest land within

the South Fork of Salt Creek sub-watershed is generally characterized by steep slopes with highly erodible soil.

42.     Although the Forest Service takes various measures to mitigate the extent to which forestry practices cause sedimentation and contamination of waterways, the 2006 Forest Plan notes that "soil and water mitigation and protection measures" have only "moderate" reliability. No mitigation measure or management practice proposed by the Forest Service is 100% effective in preventing sediment or other runoff from entering streams.

### C.     The Project: Logging, Burning and Building Roads

43.     The Project includes clearcutting, commercial logging, and prescribed burning. The Project will impact 13,500 acres, or roughly 21 square miles, in the northern part of the Hoosier National Forest within the South Fork of Salt Creek sub-watershed, which ultimately drains into Lake Monroe and is in the northwestern portion of this sub-watershed that is closest to Lake Monroe.

44.     The Project area includes very steep slopes in areas that will be subject to Project activities. As the final EA states, "steep slopes on much of the forested land exist in the South Fork Salt Creek watershed." The Forest Service's EA states that the slopes in the Project area are, at best, "moderately suited" to the use of timber harvest equipment and acknowledges that the steeper slopes in the Project area pose a "very severe" risk of erosion and are "poorly suited" to the use of timber harvest equipment.

45.     The Forest Service will conduct clearcuts over 401 acres, and will conduct other forms of timber harvest over another nearly 4,000 acres. This timber harvest will require the construction of 3.2 miles of new, permanent logging roads, 8.3 miles of new, "temporary" logging roads, the reconstruction of another 4.9 miles of logging roads, and potentially hundreds

of miles of trails and lanes created by skidders and other heavy equipment to drag and carry heavy logs over thin soils (most of which will be on hillsides and sloping ground throughout the Project area).

46.    The Project will include prescribed burns repeatedly across as many as 13,500 acres. The Forest Service plans to burn an average of 1,500 acres, or 2.3 square miles, annually, and plans to burn the same areas repeatedly. These burns will require potentially hundreds of miles of fire lanes to be cleared to duff and bare soil throughout the project area to manage and contain fire activities, and these activities will leave toxic ash on the ground that precipitation then sweeps into rivers or creeks that drain into Lake Monroe.

47.    According to the Forest Service, no timber harvesting will occur within the 100-year floodplain, which "is the highest soil disturbance risk area of sedimentation impairing the watershed." However, prescribed burning activities, which also contribute to erosion and sedimentation, may occur within the 100-year floodplain.

48.    The Project will last for well over a decade. The Forest Service anticipates that the clearcutting and other logging activities will take roughly 12 to 15 years to complete, while the Forest Service intends to conduct repeated prescribed burns in the Project area for the next 20 years.

**D.    The Forest Service's Initial Decisionmaking Process for the Project**

49.    On November 26, 2018, the Forest Service issued a scoping notice for the Project. Numerous members of the public, including Plaintiffs, submitted scoping comments. Relevant here, commenters explained the critical importance of Lake Monroe, the degraded nature of its water quality, and the fact that erosion and sedimentation—such as sedimentation associated with timber harvesting—exacerbates the existing harms to the Lake. These scoping comments

stressed that the Forest Service "do[es] not have to conduct this timber management project in the Lake Monroe watershed," and that "[t]here are alternative locations to choose from . . . that do not directly supply surface runoff for community drinking water." Despite Plaintiffs' urging, the Forest Service largely ignored the Project's impacts to Lake Monroe.

50.    On July 26, 2019, the Forest Service issued a draft EA and draft FONSI for the Project. The draft EA claimed that the Project would not have any significant impacts on the environment, including on Lake Monroe or on any aesthetic or recreational resources. The draft EA likewise denied that the Project would have direct or indirect effects on Lake Monroe, and refused to consider cumulative impacts on Lake Monroe from the Project in light of other activities in the Lake's watershed. Instead, the draft EA limited the scope of its analysis of cumulative impacts solely to the South Fork Salt Creek sub-watershed, refusing to consider whether the Project might have cumulative impacts on the downstream Lake Monroe.

51.    Numerous members of the public, including Plaintiffs, submitted comments on the draft EA that criticized the draft EA's conclusion that the Project would not significantly impact water quality in Lake Monroe. Commenters also criticized the draft EA's refusal to consider cumulative effects on the Lake Monroe watershed, and specifically described how the Project will have numerous significant environmental impacts. Accordingly, as commenters explained, the Forest Service was obligated to analyze the Project in an EIS.

52.    On November 5, 2019, the Forest Service issued a Final EA and a response to public comments. Like the draft EA and FONSI, the final EA and FONSI claimed that the Project would not have any significant impact on the environment. Despite the numerous comments explaining serious inadequacies in the draft EA's analysis of various issues, the final EA claimed that the impacts from the Project had been sufficiently analyzed in the draft EA.

Likewise, the Forest Service responded to comments explaining that the EA was incorrect to conclude that impacts on the environment would not be significant by simply pointing the commenter back to the relevant sections of the EA.

53.    On November 8, 2019, the Forest Service issued a Draft Decision Notice and FONSI for the Project. Members of the public, including Plaintiffs, timely submitted objections to the Forest Service's draft Decision Notice and FONSI. Relevant here, Plaintiffs objected to the Forest Service's conclusion that the Project would not have any significant impact on the waters of Lake Monroe.

54.    The Forest Service issued its formal response to objections on February 14, 2020. The agency insisted that its analysis of the Project's impacts to Lake Monroe—including cumulative impacts—was sufficient and that its responses to public comments adequately addressed the public's concerns. The Forest Service also dismissed objections explaining that an EIS is required in light of the unique characteristics of the geographic area (including Lake Monroe), among other factors highlighting the significance of Project impacts.

**E.    Previous Litigation Over the Project**

55.    On May 13, 2020, Plaintiffs filed a lawsuit against the Forest Service in this Court alleging various violations of NEPA in connection with its environmental review of the Project. Relevant here, Plaintiffs alleged that the Forest Service violated NEPA by failing to consider the environmental impacts of the Project on Lake Monroe, particularly in light of the lake's degraded condition. Plaintiffs' lawsuit also alleged that the Forest Service violated NEPA by failing to prepare an EIS to assess the significant impacts that the Project will have on area resources, including the cumulatively significant impacts of the Project on water quality within the Lake Monroe watershed.

56.    On March 30, 2022, this Court issued an order on the parties' cross-motions for summary judgment. Relevant here, this Court "agree[d] with Plaintiffs that [the Forest Service] failed to evaluate the potential impact of the [Project] on Lake Monroe." Op. at 14. In particular, the Final EA "failed to adequately consider or discuss the legitimate concerns the [Project] could have on Lake Monroe," the "*sole source* of drinking water for 120,000 people in southern Indiana." *Id* at 15. This Court noted that although the Final EA "discuss[es] the possibility of sedimentation to the South Fork Salt Creek and the use of best practices to reduce negative impacts, *there is no mention* of the present concerns regarding Lake Monroe's water or how the [Project] may exacerbate these problems." *Id.* Because the Forest Service never conducted the analysis of impacts required by NEPA in the first place, the agency thus "failed" to provide a "convincing statement of reasons" explaining why the impacts to Lake Monroe will not be significant. *Id.* Accordingly, this Court concluded that the Forest Service "violated NEPA by failing to fully evaluate the environmental effects to Lake Monroe," and remanded this "portion of the decision" to the agency in order for the Forest Service to conduct the requisite "analysis consistent with federal law."

## F.    <u>Lake Monroe Watershed Management Plan</u>

57.    Shortly before this Court issued its order in *Monroe County Board of Commissioners v. U.S. Forest Service*, in February 2022, Plaintiff FLM issued its WMP for Lake Monroe.

58.    The WMP explains that the "key to protecting and improving water quality in the lake is to keep pollutants . . . from reaching the streams that flow into Lake Monroe." To assist in efforts to improve water quality, the WMP calculated the current and target loads for the three main pollutants in the watershed: sediment; nitrogen; and phosphorous. "Based on these target

loads, significant reductions are required." Indeed, total phosphorus loads must be reduced by 80% overall, total nitrogen loads must be reduced by 20% overall, and total sediment loads must be reduced by 41% overall. Significantly, the South Fork of Salt Creek sub-watershed "is the most impaired and therefore has the most opportunity for improvement." Within the sub-watershed, phosphorus loads must be reduced by 86%, nitrogen loads must be reduced by 47%, and sediment loads must be reduced by 60%.

59.     The WMP recognizes that "[o]ver 82% of the Lake Monroe watershed is forested and forestry management activities such as logging, burning or herbicide application may have a negative impact on water quality." The WMP thus establishes goals of "[m]aintain[ing] forested land within the watershed as forested land" and "[m]inimiz[ing] impacts to water quality from forest management."

### G.     The Forest Service's SIR

1.     *The Draft SIR and Public Comments*

60.     On October 6, 2022, rather than prepare a supplemental EIS or EA to address in the first instance the impacts to Lake Monroe that this Court found lacking in the original EA, the Forest Service issued a draft SIR for the Project and provided a 30-day period for the public to submit comments.

61.     Plaintiffs Monroe County and FLM requested an extension of the 30-day comment period to provide sufficient time to fully review the draft SIR's cited references, obtain input from hydrologists and other experts, and compile additional peer-reviewed studies that undermine the draft SIR's assumptions and conclusory assertions. The Forest Service denied Plaintiffs' extension request, insisting that 30 days was sufficient to review the "short . . . focused document."

62.     The draft SIR is expressly intended to "address [this Court's] ruling that the Forest Service violated [NEPA] by 'failing to fully evaluate the environmental effects to Lake Monroe'" from the Project. The draft SIR characterizes this Court's order in that case as requiring the Forest Service to merely offer additional "expla[nation]" as to "why the impacts to Lake Monroe would not be significant." The Forest Service did not acknowledge this Court's ruling that the Forest Service's final EA failed to conduct a NEPA-compliant analysis of the Project's impacts to Lake Monroe in the first instance.

63.     The draft SIR touts the Forest Service's previous engagement with Plaintiff FLM and "substantial financial investments into the Monroe watersheds and the South Fork Salt Creek watersheds for restoration efforts." However, the draft SIR does not explain the relevance of those past activities to the Forest Service's examination of the direct, indirect, and cumulative impacts to Lake Monroe's water quality that will result from *this* Project.

64.     The draft SIR reiterates the final EA's assertion that the Project is needed to "meet Forest Plan objectives and to increase the resiliency and structure of forested areas (stands) by restoring the composition, structure, pattern, and ecological processes necessary to make these ecosystems sustainable."

65.     The draft SIR asserts not only that the Project will "improve water quality," but that taking no action "would pose risks to water quality." Specifically, the draft SIR explains that planned improvements to degraded trails that are proposed as part of the Project will decrease erosion and sedimentation. The draft SIR also insists that without the Project, those planned improvements will not occur. The draft SIR does not explain why the trail improvements could not occur without major logging and prescribed burning. The draft SIR also argues that the Project will improve water quality by sustaining oak species on the landscape, which "may play

an outsized role in protecting water quality as compared to the maple species" that currently dominate the landscape because oak species have lower release rates of nitrates. The draft SIR does not attempt to compare either the short- or long-term effects on water quality of logging and burning large swaths of National Forest land in the impaired Lake Monroe watershed relative to those water quality impacts of taking no action. Thus, the draft SIR does not provide any basis for concluding that taking no action would pose a risk to water quality due to the continued dominance of maple species. Finally, the draft SIR insists that taking no action "would leave the area more vulnerable to impacts of climate change and insect and disease, risking larger scale degradation and die off which could have significant implications to overall watershed health in the long run." Again, the draft SIR does not provide any analysis to support this conclusory assertion; it does not attempt to quantify the risks to water quality posed by the Project compared to taking no action, nor does it analyze the fact that the Project itself may contribute to climate change through the emissions associated with logging older trees and repeatedly burning thousands of acres of forest land, which emits greenhouse gases during burns and reduces the long-term ability of trees in the burn areas to store excess carbon once they are burned.

66.    The draft SIR concludes with "a high level of confidence" that the Project "will not add to the impairments of the Lake Monroe watersheds." In support of this assertion, the draft SIR contends that "mitigation actions" incorporated into the Project, including the prohibition on harvesting within the 100-year floodplain, the use of riparian buffers around headwater streams, and the implementation of erosion control best management practices ("BMPs"), "have been shown to be highly effective in protecting water quality and exceed those recommended by the Lake Monroe [WMP]." However, the draft SIR does not provide any quantitative or qualitative analysis to support its conclusory assertion.

67.    For example, although the draft SIR acknowledges that sedimentation from shoreline erosion is a "major concern[]" for Lake Monroe, and further acknowledges that forest management activities such as timber harvesting and prescribed burning can contribute to increased sedimentation, the draft SIR insists that the implementation of BMPs will "confine sediment within the Project area, preventing it from reaching Monroe Lake." As a result, the draft SIR argues that the Project will "not add to the problem that Lake Monroe faces due to erosion." However, the draft SIR does not attempt to quantify the amount of erosion or sediment runoff that will result from Project activities—or indeed, the amount of any pollutant that the Project will contribute to the watershed—either before or after the implementation of BMPs. Nor does the draft SIR provide any meaningful qualitative analysis to support its conclusion that the BMPs will effectively eliminate sediment and pollutant runoff from the Project. Additionally, the draft SIR reports that the Project will not degrade water quality because BMPs prohibit logging within the 100-year floodplain, which is "the highest soil disturbance risk area of sedimentation." However, that restriction does not apply to prescribed burning activities, which can also contribute to erosion and sedimentation by removing trees that otherwise strengthen soils and reduce erosion. Although the draft SIR insists that "fire monitoring data show[] that prescribed burning has no effect on soil and water resources due to the thick duff layer remaining post-burn, preventing soil displacement until the area revegetates," neither the draft SIR, nor the Final EA, nor any supporting documentation provide those data to support this assertion.

68.    The draft SIR also asserts that the Project will not contribute to the "impairment" of the South Fork of Salt Creek or Lake Monroe, as that term is defined under the Clean Water Act. According to the draft SIR, "[l]and management activity is permitted within an impaired watershed if it does not compound the current reason for impairment." The draft SIR identifies

25

the "[r]isks imposed by timber harvesting" to be "sedimentation (siltation) and potential added low concentration nutrients from displaced soils and implemented mitigations are used to minimize these risks." The draft SIR acknowledges that waters within the Project area are designated as impaired due to E. coli and low dissolved oxygen, but insists that "[n]one of the streams in the Project area are impaired from siltation, algae growth or nutrients." The draft SIR thus suggests that the Project is permitted within the impaired watershed because the main Project activity—i.e., timber harvesting—will not "compound the current reason for [the streams'] impairment." Moreover, according to the draft SIR, the implementation of BMPs will prevent sediment from reaching Lake Monroe.

69.     The draft SIR insists that monitoring of Project activities will ensure the effectiveness of BMPs at "minimizing short-term impacts on the soil and water resources and maintain[ing] or enhanc[ing] long-term productivity, water quantity, and water quality." In particular, the draft SIR reports that four sites within the 23-square-mile Project area are being monitored for turbidity, which can be used to "indicate increased sedimentation during soil disturbing projects." Over the course of the Project, "[i]f turbidity levels are monitored higher than control background information, further investigation, remediation, and monitoring would be deployed to ensure BMPs are effective within the project boundary." The draft SIR does not define "background turbidity." Nor does it explain what additional measures would be implemented if background turbidity is exceeded.

70.     Numerous members of the public, including Plaintiffs, submitted comments on the draft SIR. For example, Plaintiff FLM submitted detailed science-based comments criticizing the Forest Service's attempt to downplay the impacts of the Project on Lake Monroe by touting its prior support of FLM's efforts to improve water quality in the watershed, as well as the

agency's misplaced reliance on FLM's own WMP. According to FLM, the Forest Service cannot

escape the fact that the Project will have "highly significant impacts . . . on Lake Monroe," and

will work against the WMP's efforts to protect and improve Lake Monroe's degraded water

quality. For instance, while the WMP "specifically calls for reducing sediment and nutrient

pollution," the Project "will do the opposite by removing significant vegetation in the Lake

Monroe watershed that would otherwise safeguard against erosion and sedimentation, and by

burning vast swaths of forested lands that will contribute burnt sediment, toxic ash, and other

harmful fire byproducts to Lake Monroe." Yet, the Forest Service never examined these

significant impacts in a NEPA-compliant analysis. FLM's comments also faulted the Forest

Service for its failure to take the legally required "hard look" at the direct, indirect, and

cumulative impacts of the Project on the water quality of Lake Monroe. FLM explained that

although "[n]o single land use is solely responsible" for the watershed's severely degraded

condition, the cumulative impacts of all land uses on Lake Monroe "are unequivocally

significant." Yet, as FLM's comments explain, the Forest Service never examined these additive

effects, either in the draft SIR or in any other NEPA document.

71.    FLM's comments likewise highlighted several factual errors and methodological

flaws that undermine the draft SIR's discussion of the effects of the Project on Lake Monroe. For

example, FLM criticized the draft SIR's attempts to downplay the Project's significant impacts

on the watershed by insinuating that agriculture is the main driver of the degradation of water

quality. As FLM's comments explain, "both the South Fork and North Fork [of Salt Creek] are

dominated by forested land and . . . are major contributors of [p]hosphorus, [n]itrogen, and

sediment to Lake Monroe." Indeed, FLM's own WMP demonstrates that "erosion from disturbed

steep slopes—as will occur from the [Project]—is a contributor to water quality degradation"

within the watershed. Moreover, the draft SIR's assertion that "[n]one of the streams in the [P]roject area are impaired from siltation, algae growth, or nutrients" is directly contradicted by the draft SIR's acknowledgment that the stream is impaired by "low dissolved oxygen." As FLM's comments explain, "as a matter of basic hydrology, [] low dissolved oxygen often occurs due to an excess of nutrients, which in turn stimulates primary production and depletes oxygen." Yet, this fact "is not reflected accurately in the SIR."

72.    FLM's comments also provide specific factual evidence to dispute the draft SIR's conclusion that the implementation of best management practices BMPs can effectively eliminate the "threats to water quality from the proposed extensive logging and burning" and "bring the level of impacts to Lake Monroe below the threshold of 'significance'" as defined by NEPA. As FLM's comments explain, the best available science demonstrates that while the implementation of such measures may reduce such threats, "the only way to genuinely ensure that there will be no significant impacts . . . is to leave the forest intact and forgo logging and burning in the Lake Monroe watershed." FLM's comments further explain that both the final EA and SIR "ignore the ineffectiveness of prior mitigation efforts" by the Forest Service "involving BMPs comparable to those proposed here." The well-documented history of the failure of the very BMPs that Forest Service relies upon to justify its determination that the impacts to Lake Monroe from *this* Project will be insignificant "demonstrate that the [Project] is proposed in an area that is unsuitable for logging, burning or road and trail-building." The historical ineffectiveness of BMPs likewise demonstrates that "these activities, as proposed, have a high probability of causing sediment and nutrient pollution in Lake Monroe."

73.    FLM's comments also criticized the draft SIR's unfounded and "irrational" assertion that the Forest Service's adoption of the "no action" alternative "would mean that [the

agency] cannot implement various watershed improvement projects to benefit Lake Monroe's water quality (such as vernal ponds and culverts) that it has proposed as part of this project." There is no legal or logical basis for the Forest Service's argument. In fact, as FLM's comments points out, both the organization "and other stakeholders with specialized knowledge of local water quality issues have specifically requested that [the Forest Service] consider and examine an alternative that would allow for these watershed improvement projects without undertaking the proposed vegetation management activities." However, to date, the Forest Service "has avoided this analysis despite NEPA's requirement that the agency must consider all feasible alternatives."

74.     FLM's comments argue that, in light of the Project's significant direct, indirect, and cumulative impacts to Lake Monroe's water quality, the effects of the Project must be fully evaluated in an EIS. The failure to examine the Project's significant indirect and cumulative impacts is not harmless; as FLM noted, "many of the cumulative impacts result from private activities that will never receive any federal scrutiny under NEPA or other environmental laws."

75.     Plaintiff IFA also submitted comments on the draft SIR, which were endorsed by representatives of Plaintiff Monroe County Commissioners. IFA's comments noted that IFA's ability to provide exhaustive comments on all of the important issues raised by the draft SIR was significantly undermined by the needlessly short 30-day comment period.

76.     IFA's comments criticized the Forest Service's decision to consider the impacts of the Project on Lake Monroe in an SIR. IFA's comments explain that by considering the Project's impacts to Lake Monroe in isolation from the Project's serious impacts to other resources, the Forest Service improperly segmented the analysis and failed to provide a comprehensive evaluation of the Project's environmental effects, as required by NEPA. IFA's

comments thus urge the Forest Service to fully comply with NEPA and the APA and conduct a NEPA-compliant environmental analysis that takes the legally required "hard look" at the Project's impacts to all affected resources. IFA's comments also dispute the Forest Service's assertion that the agency may immediately resume implementing the Project upon the issuance of the final SIR, without any further review of the agency's NEPA compliance by this Court. IFA's comments explain that the Forest Service's newly articulated position contradicts the agency's earlier assurances that it would not "commence implementation of the Project unless or until [this Court] determine[s] that the agency has complied with NEPA" and is therefore arbitrary and capricious.

77.    IFA's comments dispute the draft SIR's conclusion that the Project will not significantly impact water quality in Lake Monroe. IFA's comments specifically contend that the Forest Service's assertion that Project activities are "too far from Lake Monroe to negatively affect the Lake defies basic science." IFA's comments explain that forest management activities such as logging, prescribed burning, and road building are known to cause high levels of sediment runoff, particularly when conducted on steep ground with highly erodible soils—i.e., the exact circumstances presented here. IFA's comments stress that "[t]here is no scientific basis to assume that sediment and nutrients" in runoff from the Project area "will settle out of the water column . . . before it reaches Lake Monroe." Nor does the Forest Service provide any such basis for its assumption. Rather, the draft SIR provides no research or data supporting this assumption and "is silent on the potential for increased stream bank erosion from [the Project] even though such erosion is a normal impact of timber harvesting operations including harvests like this one," even when undertaken with BMPs. IFA's comments also point out a basic inconsistency, explaining that "the statement in the Draft SIR on page 21 that 'eroding trails,

roads and undersized culverts are contributing sediment to the South Fork watershed, and ultimately Lake Monroe, and need to be repaired,' plainly indicates that the [Forest Service] knows that sediment from activities in the Houston South Project area *will* reach the Lake Monroe water supply. Wearing blinders and pretending as if *this* sediment is somehow different from other sediment in these watersheds is illogical, irrational, and arbitrary."

78.    IFA's comments likewise criticize the draft SIR's failure to "provide a well-founded estimate of the additional loads of sediment and nutrients that will be released by the [Project] into the watershed of the South Fork of Salt Creek," and by extension, Lake Monroe. "Lacking any estimate" or meaningful discussion of the Project's contributions to pollution loads in Lake Monroe, IFA explains that the public is unable to "assess [the draft SIR's] assertions that the impact of the [P]roject" on the watershed "will be insignificant."

79.    IFA's comments also provide specific factual evidence to dispute the draft SIR's assertion that the implementation of BMPs can effectively eliminate the Project's significant impacts on Lake Monroe. IFA's comments provided highly detailed discussions of peer-reviewed studies demonstrating that even with the implementation of BMPs, statistically significant increases in pollutant concentrations, including nitrogen and sediment, occurs in streams draining watersheds that were logged compared to concentrations in streams draining watersheds that remained uncut. For example, IFA's comments described one study demonstrating that even with the implementation of BMPs, increased runoff and streambank erosion and heightened sedimentation occurred in streams draining logged watersheds for years after logging concluded. That study additionally demonstrated that the statistically significant increase in the discharge of nutrients from areas logged using BMPs was nearly as high as the discharge from areas logged without using BMPs. Thus, contrary to the Forest Service's largely

unsubstantiated assertion that BMPs "eliminate" the pollution problem," the best available science demonstrates that the implementation of BMPs do not reduce nutrient loading below significant levels from logging. Yet, the draft SIR does not provide any "analysis, scientific or otherwise in the [d]raft SIR that . . . the BMPs to be utilized in the [Project] will stop polluted runoff that will be generated by these activities from reaching Lake Monroe." IFA's comments explain that the results of the cited studies raise significant concerns for the Project, which will occur in an area characterized by erodible soils on steep slopes and a high incidence of streambank erosion, and argue that the Forest Service must incorporate this new information into its analysis of the Project's impacts.

80.    IFA's comments likewise criticize the draft SIR's unsupported assertion that "fire monitoring data shows that prescribed burning has no effect on soil and water resources." For example, IFA's comments explain that in light of the geography of the Project area—i.e., steep slopes with thin soils that are prone to erosion even without human intervention—the draft SIR's assertion that that a "thick duff layer" will remain "post-burn [and] prevent[] soil displacement until the area re-vegetates" is factually inaccurate. IFA's comments proceed to provide highly detailed descriptions of studies demonstrating that prescribed burns significantly increase both rainfall runoff and sedimentation levels in affected watersheds, which in turn degrades water quality.

81.    IFA's comments explain that Lake Monroe and the South Fork of Salt Creek are recognized as "impaired" under the Clean Water Act, and that the WMP, which the draft SIR "repeatedly professes to support," likewise demonstrates that water quality in Lake Monroe and its tributaries is degraded largely due to nitrogen and sediment loading. IFA's comments further explain that to improve water quality and achieve the WMP's goals, nutrient and sediment

loading must *decrease*; any activities that *increase* sediment and nutrient runoff undermine the WMP's efforts. As IFA's comments explain, even if the Forest Service implements BMPs perfectly when conducting Project activities (which never occurs in practice), "there will still be negative water quality impacts from its activities, a fact that the [d]raft SIR does not examine." Nor does the draft SIR "examine or discuss how these additional water quality impacts will undermine the Clean Water Act's antidegradation policies" or impact efforts to "accomplish the objectives of the [WMP]." IFA argues that "[i]f the USFS is genuinely supportive of the [WMP's] goals, the [d]raft SIR would provide credible estimates" of the Project's contributions to nutrient and sediment levels in the watershed.

82.     IFA's comments explain that its serious concerns with the draft SIR are compounded by the fact that the document "does not provide clear and effective corrective action standards that will be utilized . . . to prevent sediment and nutrient polluted runoff from the project's substantial logging, burning and road-building activities from entering [Lake Monroe's watershed] and worsening its impaired condition." IFA criticizes the draft SIR's proposal to use broad and imprecise parameters to monitor the Project's impacts on water quality, as well as the lack of credible baseline data from which to measure the effects and determine whether corrective action is necessary. IFA's comments likewise criticize the draft SIR's failure to precisely describe the conditions that would trigger corrective actions on the part of the Forest Service, or even what those corrective actions would entail. Without such information, the public lacks "confidence that project activities affecting water quality will be ascertained and corrected before increased sediment and nutrients from the activities reaches [Lake] Monroe."

83.     Additionally, IFA's comments point out that repeated burning on more than 2,000 acres in the northwestern portion of the Project area will produce polluted runoff on steep slopes

draining into three large intermittent streams that enter the South Fork of Salt Creek downstream from the Project's farthest downstream monitoring point. Yet the runoff from the prescribed burning undertaken 2-3 times on approximately four-square miles of hilly national forest land in this Project north of the Maumee Boy Scout Reservation will not even be monitored, thereby allowing significant levels of suspended sediment and nutrients from that activity to reach the South Fork of Salt Creek and Monroe Reservoir without the Forest Service even learning of the problem or triggering the need to take any corrective action.

84.    Ultimately, IFA's comments conclude that the draft SIR fails to take the "legally required hard look at the impacts of the [Project], fail[s] to consider feasible alternatives that would have less damaging environmental impacts (including to Lake Monroe), and act[s] arbitrarily and unlawfully in determining that the Project will result in no significant impact and thus does not require an [EIS]." As a result, the draft SIR merely "compounds the errors already committed by the [Forest Service] in its [final EA] for this Project, and remains inconsistent with [NEPA] and the [APA]."

> 2.    *Final SIR and Decision*

85.    On December 5, 2022, the Forest Service issued a final SIR, accompanied by a short cover letter explaining the Forest Service's final decision. The final SIR appears nearly identical to the draft SIR.

86.    The cover letter explains the Forest Service's view that the final SIR brings its decision regarding the Project into compliance with applicable law. In particular, the agency asserts that the final SIR "clarified and updated relevant portions of the existing project record with additional information, analysis, and context responsive to the Court's ruling." According to the agency, "consideration of the information contained, and incorporated by reference, in the

Final SIR addresses the Court's ruling by fully evaluating environmental effects to Lake Monroe from the [Project]."

87.     The cover letter also sets forth the Forest Service's "decision" that the final SIR demonstrates that a "correction, supplement, or revision to the [Project] EA is not necessary." According to the Forest Service, the final SIR "did not identify any change in effects or other aspects of the [P]roject." The agency therefore insists that the existing environmental analysis is adequate to support" the original decision set forth in the final EA, FONSI, and Decision Record.

88.     The final SIR and cover letter declined to respond to public comments that were critical of the Forest Service's assessment of impacts to water quality. According to the final SIR, "the information received from those who still did not support the project, raised concerns that had been previously addressed in the EA and project record and no further information or clarification was needed." The draft SIR thus refused to consider, and failed to respond, to the highly relevant comments, scientific studies, methodological concerns, and other information submitted by Plaintiffs and other members of the public during the comment period.

89.     On information and belief, the Forest Service intends, without issuing any new NEPA document, to proceed with implementation of Project-related activities—including extensive logging and burning in the Lake Monroe watershed—as soon as late February 2023. If this occurs, it will irreversibly injure Plaintiffs' public health, safety, aesthetic, recreational, scientific, professional, and other interests in conserving the Lake Monroe watershed and the ecosystem in the Project area from irreparable, devastating harm.

# CLAIM FOR RELIEF

## Violations of NEPA and the APA

90.     Plaintiffs incorporate all preceding paragraphs by reference.

91.     By preparing an SIR instead of a NEPA document (i.e., an EA or an EIS) to assess the impacts of the Project on the Lake Monroe watershed after this Court determined that the Forest Service never took the legally-required "hard look" at the direct, indirect, and cumulative impacts of the Project in the agency's initial environmental decisionmaking process, the Forest Service violated NEPA, its implementing regulations, and the APA.

92.     By conflating the purpose of an EIS or EA with the legally distinct purpose of an SIR, and by using an SIR not only to evaluate the significance of new information but also to present information and analysis regarding the Project's impacts to Lake Monroe that existed at the time of the agency's original EA and FONSI, the Forest Service violated NEPA, its implementing regulations, and the APA.

93.     By failing to conduct a complete analysis of the direct, indirect, and cumulative impacts of the Project on the Lake Monroe watershed and its environmental resources in either the final SIR or the agency's previous environmental review of the Project, the Forest Service violated NEPA, its implementing regulations, and the APA.

94.     By concluding that the Project will not result in significant impacts to Lake Monroe—or any other affected resource in the Project area—the Forest Service failed to take "hard look" at the effects of its action including on the basis of scientific and factual evidence in the record running contrary to the agency's conclusion, and thus violated NEPA, its implementing regulations, and the APA.

95.    By deciding not to prepare an EIS to consider the highly significant impacts of the Project—despite the existence of substantial impacts to several of NEPA's "significance" factors identified at 40 C.F.R. § 1508.27(b), including but not limited to factor (b)(2), (b)(3), (b)(4), (b)(5), (b)(7), and (b)(10)—the Forest Service violated NEPA, its implementing regulations, and the APA.

96.    By declining to prepare a supplemental EIS or an EA while segmenting the agency's consideration of impacts from Lake Monroe from all other highly significant impacts previously identified to the agency through public comments, the Forest Service violated NEPA, its implementing regulations, and the APA.

97.    By failing to prepare a supplemental EA or EIS to assess the significant new information provided by members of the public, including Plaintiffs, in response to the Forest Service's request for comments on the draft SIR, despite the fact that the new information provided to the agency was highly relevant to environmental concerns and bore directly on the Project and its impacts, the Forest Service violated NEPA, its implementing regulations, and the APA.

98.    By failing to adequately consider or respond to myriad substantive comments and new information supplied during the draft SIR comment process by members of the public, including Plaintiffs, the Forest Service violated NEPA, its implementing regulations, and the APA.

99.    By deciding that the agency may proceed with project implementation without preparing a supplemental EIS or EA, the Forest Service violated NEPA, its implementing regulations, and the APA.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter an Order:

1.      Declaring that Defendants' decision to undertake the Project without a supplemental EIS or EA is in violation of NEPA, as well as the legally deficient analysis in its Final SIR, are arbitrary and capricious;

2.      Enjoining Defendants from taking any action to implement the Project pending compliance with federal law;

3.      Vacating the SIR, Decision Record, EA, and FONSI;

4.      Remanding the challenged decision to the Forest Service for further analysis and decisionmaking consistent with its duties under NEPA and the APA;

5.      Awarding Plaintiffs their reasonable attorneys' fees and costs in this action; and

6.      Providing any other relief that the Court deems proper.

Respectfully submitted,

*/s/ Russell Sipes*
Russell Sipes
The Sipes Law Firm
136 E. Market Street, #700
Indianapolis, IN 46204
(855) 747-3752
wrs@sipeslawfirm.com

*/s/ William S. Eubanks II*
William S. Eubanks II
(pro hac vice application
forthcoming)
EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(970) 703-6060
bill@eubankslegal.com