**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

| | | |
|---|---|---|
| MONROE COUNTY BOARD OF COMMISSIONERS, et al., | ) ) ) | |
| *Plaintiffs*, | ) ) | Case No. 4:23-cv-00012-TWP-KMB |
| v. | ) ) | |
| UNITED STATES FOREST SERVICE, et al., | ) ) | |
| *Defendants*. | ) ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR A PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................... ii

GLOSSARY ............................................................................................................... vi

INTRODUCTION ........................................................................................................ 1

BACKGROUND .......................................................................................................... 2

   I.    STATUTORY AND REGULATORY FRAMEWORK ......................................... 3

      A.   The National Environmental Policy Act ..................................................... 3

      B.   The Administrative Procedure Act ............................................................ 6

   II.   FACTUAL BACKGROUND ......................................................................... 7

      A.   The Hoosier National Forest ..................................................................... 7

      B.   Water Resources in and near the Project Area ........................................... 8

      C.   The Project: Burning, Logging, Herbicide Application, and Road Building ............... 11

      D.   The Forest Service's Initial Decision and the Prior Litigation ...................... 12

      E.   The Lake Monroe Watershed Management Plan ...................................... 14

      F.   The Forest Service's Draft SIR ............................................................... 14

      G.   The Agency's Final SIR and Decision ..................................................... 20

ARGUMENT ............................................................................................................. 21

   I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................................... 22

      A.   The Forest Service's Failure to Prepare an EIS or EA Is Unlawful ............... 22

      B.   The Failure to Respond to Comments Violates NEPA and the APA ............ 25

      C.   The SIR's Assertions and Conclusions Are Arbitrary and Capricious ......... 27

   II.   PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE HARM IN THE
      ABSENCE OF AN INJUNCTION ................................................................. 29

   III.  THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST TIP
      SHARPLY IN FAVOR OF PRELIMINARY INJUNCTIVE RELIEF ...................... 32

CONCLUSION ........................................................................................................... 35

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011) .................................................................31

*All. for the Wild Rockies v. Pierson,*
550 F. Supp. 3d 894 (D. Idaho 2021) ...............................................28, 30

*All. for the Wild Rockies v. Wood,.*
No. 07-cv-452, 2008 WL 2152237 (D. Idaho May 21, 2008)...............34

*Allied Loc. & Reg'l Mfrs. Caucus v. U.S. E.P.A.,*
215 F.3d 61 (D.C. Cir. 2000).................................................................25

*Am. Wild Horse Pres. Campaign v. Zinke,*
No. 16-cv-1, 2017 WL 4349012 (D. Idaho Sept. 29, 2017) ............27, 28

*Amoco Prod. Co. v. Vill. of Gambell,*
480 U.S. 531 (1987).........................................................................29, 32

*Ariz. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.,*
273 F.3d 1229 (9th Cir. 2001) .................................................................6

*Baxley v. U.S. Army Corps of Eng'rs,*
411 F. Supp. 1261 (D. Ala. 1976)..........................................................35

*Brady Campaign to Prevent Gun Violence v. Salazar,*
612 F. Supp. 2d 1 (D.D.C. 2009)............................................................34

*Buckeye Forest Council v. U.S. Forest Serv.,*
337 F. Supp. 2d 1030 (S.D. Ohio 2004) ................................................30

*Colo. Wild v. U.S. Forest Serv.,*
299 F. Supp. 2d 1184 (D. Colo. 2004)....................................................35

*Cook Cty., Ill. v. Wolf,*
962 F.3d 208 (7th Cir. 2020) ...........................................................22, 32

*Del. Dep't of Nat. Res. v. EPA,*
785 F.3d 1 (D.C. Cir. 2015).....................................................................25

*Envtl. Prot. Agency v. Envtl. Waste Control, Inc.,*
917 F.2d 327 (7th Cir. 1990) ..................................................................32

*Found. on Econ. Trends v. Heckler*,
    756 F.2d 143 (D.C. Cir. 1985) ................................................................29

*Friends of the Clearwater v. McAllister*,
    214 F. Supp. 2d 1083 (D. Mont. 2002) ...................................................24

*Fund for Animals v. Espy*,
    814 F. Supp. 142 (D.D.C. 1993) ............................................................34

*Habitat Educ. Ctr. v. Bosworth*,
    381 F. Supp. 2d 842 (E.D. Wis. 2005) ..............................................30, 34

*Idaho Sporting Cong. v. Alexander*,
    222 F.3d 562 (9th Cir. 2000) .......................................................22, 23, 24

*League of Wilderness Defs. v. Zielinski*,
    187 F. Supp. 2d 1263 (D. Or. 2002) ......................................................35

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) ...............................................................................35

*Mich. v. U.S. Army Corps of Eng'rs*,
    667 F.3d 765 (7th Cir. 2011) ............................................................29, 32

*Monroe Cty. Bd. of Comm'rs v. U.S. Forest Serv.*,
    595 F. Supp. 3d 713 (S.D. Ind. 2022) .......................................12, 13, 23

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..........................................................................6, 27, 28

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
    241 F.3d 722 (9th Cir. 2001) .................................................................27

*Nat'l Wildlife Fed'n v. Burford*,
    835 F.2d 305 (D.C. Cir. 1987) ...............................................................34

*Native Ecosystems Council v. Mehlhoff*,
    No. 20-cv-19, 2020 WL 3969343 (D. Mont. July 6, 2020) ....................30

*Olympic Forest Coal. v. U.S. Forest Serv.*,
    556 F. Supp. 2d 1198 (W.D. Wash. 2008) .............................................23

*Or. Natural Res. Council v. U.S. Forest Serv.*,
    293 F. Supp. 2d 1200 (D. Or. 2003) .................................................23, 24

*Pac. Coast Fed'n of Fishermens Ass'ns v. Nat'l Marine Fisheries Serv.*,
    482 F. Supp. 2d 1248 (W.D. Wash. 2007) .............................................26

*Save Strawberry Canyon v. Dep't of Energy*,
      613 F. Supp. 2d 1177 (N.D. Cal. 2009) ...................................................35

*Scherr v. Volpe*,
      466 F.2d 1027 (7th Cir. 1972) .............................................................35

*Seattle Audubon Soc'y v. Moseley*,
      798 F. Supp. 1473 (W.D. Wash. 1992).................................................26

*Sierra Club v. Block*,
      614 F. Supp. 488 (D.D.C. 1985) ...........................................................35

*Sierra Club v. Marsh*,
      872 F.2d 497 (1st Cir. 1989).................................................................29

*Sierra Club v. U.S. Army Corps of Eng'rs*,
      772 F.2d 1043 (2d Cir. 1985)................................................................25

*Sierra Club v. Van Antwerp*,
      661 F.3d 1147 (D.C. Cir. 2011).............................................................25

*Simmons v. U.S. Army Corps of Eng'rs*,
      120 F.3d 664 (7th Cir. 1997) ................................................................33

*Siskiyou Regional Educ. Proj. v. Goodman*,.
      No. 04-cv-3058, 2004 WL 1737738 (D. Or. Aug. 3, 2004) ....................34

*Swan View Coal. v. Weber*,
      No. 13-cv-129, 2016 WL 160654 (D. Mont. Jan. 13, 2016) ..................23

*W. Watersheds Proj. v. Kraayenbrink*,
      632 F.3d 472 (9th Cir. 2011) ................................................................26

*W. Watersheds Proj. v. Zinke*,
      336 F. Supp. 2d 1204 (D. Idaho 2018) .................................................29

*Wilderness Soc'y v. Bosworth*,
      118 F. Supp. 2d 1082 (D. Mont. 2000)..................................................32

*Winter v. Natural Res. Def. Council*,
      555 U.S. 7 (2008)..................................................................................21

*Wis. Heritages v. Harris*,
      476 F. Supp. 300 (E.D. Wis. 1979).......................................................35

**Statutes**

5 U.S.C. § 706 ................................................................................................................6

42 U.S.C. § 4332 ........................................................................................................3, 4

**Regulations**

40 C.F.R. § 1500.1 .....................................................................................................3, 5

40 C.F.R. § 1500.3 .........................................................................................................3

40 C.F.R. § 1501.4 .........................................................................................................4

40 C.F.R. § 1502.1 .........................................................................................................4

40 C.F.R. § 1502.9 ......................................................................................................5, 25

40 C.F.R. § 1502.13 .......................................................................................................4

40 C.F.R. § 1502.14 .......................................................................................................4

40 C.F.R. § 1502.16 .......................................................................................................4

40 C.F.R. § 1503.4 ......................................................................................................5, 25

40 C.F.R. § 1508.7 .........................................................................................................4

40 C.F.R. § 1508.8 ......................................................................................................3, 4

40 C.F.R. § 1508.9 .........................................................................................................4

40 C.F.R. § 1508.25 .......................................................................................................4

40 C.F.R. § 1508.27 .......................................................................................................5

## **GLOSSARY**

| | |
|---|---|
| APA | Administrative Procedure Act |
| BMP | Best Management Practice |
| CEQ | Council on Environmental Quality |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FLM | Friends of Lake Monroe |
| IFA | Indiana Forest Alliance |
| NEPA | National Environmental Policy Act |
| SIR | Supplemental Information Report |
| WMP | Watershed Management Plan |

## INTRODUCTION

Once again, this Court is faced with the legality of the Houston South Vegetation Management and Restoration Project ("the Project"), in which the U.S. Forest Service will burn, log, and apply hazardous chemicals to *thousands of acres* of the Hoosier National Forest, including on steep, highly erodible terrain that will drain pollutants such as sediment, ash, and toxic chemicals into Lake Monroe—the sole drinking water source for nearly 150,000 people.

Last year, this Court ordered the Forest Service to conduct the legally required analysis of serious health, safety, environmental, and recreational impacts to Lake Monroe that the agency failed to examine in its November 2019 Environmental Assessment ("2019 EA"). Rather than undertake this evaluation by preparing a supplemental Environmental Impact Statement ("EIS") or a supplemental EA, as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, the Forest Service instead prepared a *non-NEPA* document called a Supplemental Information Report ("SIR"). But an SIR, by definition, serves one narrow purpose—to evaluate *new* information that post-dates an agency decision, to determine whether the new information is significant and warrants a supplemental EIS or EA. For this reason, an SIR cannot substitute for an EIS or EA, including where, as here, much of the information analyzed in the SIR in fact pre-dates the agency's original decision and EA. Because the agency flouted this Court's order and NEPA, Plaintiffs are very likely to succeed on the merits.

The other injunction factors also tip sharply in Plaintiffs' favor. First, Plaintiffs face significant, irreparable harm to their recreational, aesthetic, health, and safety interests in Lake Monroe and in the specific areas of the Hoosier National Forest regularly used by Plaintiffs that will be fundamentally altered and permanently destroyed. In the absence of an injunction, the Forest Service will commence widescale prescribed burns in April 2023 in some of the most

remote, pristine forested habitat in Indiana. These areas provide essential habitat to many wildlife species (including federally and state protected species) and consist of extremely steep, highly erodible terrain that drains into Lake Monroe. Damage from the planned burns will irreversibly destroy the natural character, setting, and feel of these mature forested areas, and will result in toxic ash, sediment, and other pollutants entering the Lake Monroe watershed.

Next, there is no countervailing need—let alone a compelling one—for why the Forest Service must conduct these prescribed burns before the Court can have an opportunity to resolve this case on the merits. This is especially so in light of the fact that the Forest Service waited *14 years* after issuing its 2006 Forest Plan to authorize the Project, thereby undercutting any equitable argument that the agency cannot wait one more year until this case is resolved.

Finally, the public interest weighs strongly in favor of an injunction. Especially where this Court has already ruled that the Forest Service violated NEPA by failing to adequately consider the impacts of the Project on Lake Monroe, the public has a paramount interest in holding the Forest Service accountable under federal law before it commences widespread burning, logging, and herbicide application. This is all the more so where, as here, the Project involves both a major drinking water supply and federal lands that belong to our nation's citizens. Put simply, it would eviscerate the public interest prong if the Forest Service could burn thousands of acres of land (and then log and apply chemicals to the Project area) without first having to comply with the environmental law Congress enacted specifically to avoid uninformed decisionmaking of this kind, while evading this Court's order in the process.

## **BACKGROUND**

Plaintiffs' Complaint contains a detailed legal and factual background. *See* ECF No. 1 ¶¶ 23-89. Here, Plaintiffs briefly describe the information necessary to resolve the instant motion.

## I.     STATUTORY AND REGULATORY FRAMEWORK

### A.     The National Environmental Policy Act

NEPA is the nation's "basic national charter for protection of the environment." 40

C.F.R. § 1500.1(a). Its purposes are to "help public officials make decisions that are based on

understanding of environmental consequences, and to take actions that protect, restore, and

enhance the environment," and to "insure that environmental information is available to public

officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b),

(c). The Council on Environmental Quality ("CEQ")—an agency within the Executive Office of

the President—has promulgated regulations implementing NEPA, *see* 40 C.F.R. §§ 1500–1508,

which are "binding on all federal agencies." *Id.* § 1500.3.[1]

To accomplish its underlying goals, NEPA requires federal agencies to prepare a

"detailed statement"—i.e., an EIS—for all "major federal actions significantly affecting the

quality of the human environment." 42 U.S.C. § 4332(C). An EIS must describe (1) "the

environmental impact of the proposed action," (2) "the adverse environmental effects which

cannot be avoided," and (3) "alternatives to the proposed action." 42 U.S.C. § 4332(C)(i)–(iii).

The environmental impacts that require analysis under NEPA are far broader than just those

affecting the ecosystem itself; such effects include "ecological (such as the effects on natural

resources and on the components, structures, and functioning of affected ecosystems), aesthetic,

historic, cultural, economic, social, or health" impacts. 40 C.F.R. § 1508.8(b).

Each EIS must consider the underlying federal "purpose and need" for the proposed

action, and "rigorously explore and objectively evaluate" the environmental impacts of "all

---

[1] After the Forest Service made its Project decision in 2020, the Trump administration amended
the CEQ's regulations that implement NEPA. *See* 85 Fed. Reg. 43,304 (July 16, 2020).
However, the new regulations do not apply to this case, both because the Project decision
preceded those amendments and because the Biden administration is actively revising the Trump
administration's regulatory amendments.

reasonable alternatives" to the proposed action. 40 C.F.R. §§ 1502.13, .14 (emphasis added). NEPA further provides that agencies "shall . . . study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E). CEQ has deemed the alternatives analysis "the heart" of the NEPA process because it "present[s] the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

NEPA requires that, in evaluating the alternatives of a proposed action, agencies take a "hard look" at the effects of the proposal compared to all reasonable alternatives. *See* 40 C.F.R. §§ 1502.1, .16. Agencies must assess the direct, indirect, and cumulative impacts of the proposed action, including adverse environmental effects that cannot be avoided. *Id.* § 1508.25. Direct effects are those "caused by the action and occur at the same time and place," while indirect effects are those "caused by the action" that occur "later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8. Cumulative impacts are those that result from the "incremental impact[s]" of the proposed action when added to the impacts of other past, present, and reasonably foreseeable future actions, whether undertaken by other federal agencies or private third parties. *Id.* § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

To aid in determining whether an EIS is required, an agency may prepare an EA to analyze the impacts of the proposed action and its alternatives. 40 C.F.R. §§ 1501.4(c), 1508.9. Although less rigorous than an EIS, an EA must "include brief discussions" analyzing direct, indirect, and cumulative impacts of the proposed action, as well as alternatives to it. *Id.* § 1508.9.

4

In determining whether an EIS is required, an agency must consider whether the proposed action will have a "significant" effect on the human environment. 40 C.F.R. § 1508.27. The "significance" determination is based on numerous factors, including "[t]he degree to which the proposed action affects public health and safety," the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas," "the degree to which the effects on the quality of the human environment are likely to be highly controversial," "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," and "[t]he degree to which the action may adversely affect an endangered or threatened species." *Id.* § 1508.27(b). An action is also significant if it "is related to other actions with individually insignificant but cumulatively significant impacts." *Id.* § 1508.27(b)(7). The presence of any one of these factors may require the preparation of an EIS.

Whether an agency prepares an EIS or an EA, public participation, including disclosure of information concerning an action, its effects, and reasonable alternatives, is central to NEPA. The CEQ regulations require that "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b). To this end, agencies must respond to comments and opposing viewpoints from the public raising questions about the agency's analysis. *Id.* § 1503.4, 1502.9(c).

Only after an agency has prepared a NEPA-compliant EIS or EA, it may prepare an SIR when new information comes to light for the sole purpose of evaluating new post-EIS (or post-EA) information to determine whether it is sufficiently significant to warrant a supplemental EIS or EA. The Forest Service's NEPA Handbook makes clear that "[a] SIR is not a NEPA document and therefore cannot be used to fulfill the requirements for a revised or supplemental

EA or EIS." Forest Service, *Handbook 1909.15* (2012), Chap. 10 § 18.1,

https://www.fs.usda.gov/cgi-bin/Directives/get_dirs/fsh?1909.15. Likewise, the Handbook

explains that "[a] SIR cannot repair deficiencies in the original environmental analysis or

documentation, nor can it change a decision" by the agency." *Id.*

### B.     The Administrative Procedure Act

Federal agencies' compliance with NEPA is reviewable under the Administrative

Procedure Act ("APA"), which provides that the reviewing "court shall . . . hold unlawful and set

aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law," or that is adopted "without observance of

procedure required by law." 5 U.S.C. § 706(2)(A). An action is "arbitrary and capricious if the

agency . . . entirely failed to consider an important aspect of the problem, [or] offered an

explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle*

*Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "[T]he agency must

examine the relevant data and articulate a satisfactory explanation for its action including a

rational connection between the facts found and the choice made." *Id.*

While arbitrary and capricious review is deferential, "[j]udicial review is meaningless . . .

unless [the court] carefully review[s] the record to 'ensure that agency decisions are founded on

a reasoned evaluation of the relevant factors.'" *Ariz. Cattle Growers Ass'n v. U.S. Fish &*

*Wildlife Serv.*, 273 F.3d 1229, 1236 (9th Cir. 2001) (quoting *Marsh v. Or. Nat. Res. Council*, 490

U.S. 360, 378 (1989)). Thus, courts "must not 'rubber-stamp . . . administrative decisions that

they deem inconsistent with a statutory mandate or that frustrate the congressional policy

underlying a statute.'" *Id*. (quoting *NLRB v. Brown*, 380 U.S. 278, 291–92 (1965)).

II.     **FACTUAL BACKGROUND**

    A.     **The Hoosier National Forest**

The Hoosier National Forest, which the Forest Service describes as "Indiana's National Treasure," is the only national forest in Indiana.[2] The Hoosier National Forest provides habitat for numerous wildlife species, including imperiled species protected by the Endangered Species Act, as well as species recognized as rare or vulnerable by the State of Indiana or by the Forest Service itself. The Hoosier National Forest provides some of the most popular opportunities in the state of Indiana for outdoor recreation such as hiking, camping, and birdwatching.

The Hoosier National Forest was established in 1935. According to the 2006 Forest Plan, "[t]he driving force for establishing the Hoosier was to stabilize and restore eroding lands and protect watersheds from sediment." Forest Serv., Land & Resources Mgmt. Plan (2006) ("2006 Forest Plan") at 2-3, https://www.fs.usda.gov/main/hoosier/landmanagement/planning. Widespread deforestation in Indiana around 1900 led to extensive damage to soils, watersheds, and waterways, and the Hoosier National Forest was established in part to halt and reverse this environmental damage. *Id.* The Hoosier National Forest has pursued that goal by acquiring large parcels of contiguous land and by promoting reforestation in order to retain soils, prevent adverse impacts to waterways, and provide for a healthy ecosystem. For example, in order to protect and restore soil, and to prevent sediment from flowing into local watersheds, the Forest Service planted various species of trees, including pines, on slopes that otherwise were prone to erosion, including slopes within the Project area.

The Forest Plan aims to continue "the historic mission of the Hoosier for watershed protection and restoration." *Id.* It includes a "goal," or an "overall purpose of the Forest," to

---

[2] *See* Forest Serv., *Hoosier National Forest – Indiana's National Treasure*, https://www.youtube.com/watch?v=8qWerRFJWjc (last accessed January 9, 2023).

"Maintain and Restore Watershed Health." *Id.* The Plan notes that "[t]his goal emphasizes collaborative stewardship of watersheds" and asserts that "[t]he Forest will contribute to the restoration of water quality and soil productivity to improve the condition of those watersheds impacted by past land use practices." *Id.* It further states that the Forest Service will "[g]ive priority to stabilizing areas discharging soil into watercourses, especially those that affect the watershed of municipal or recreational reservoirs." *Id.* at 3-13.

     **B.**     **Water Resources in and near the Project Area**

The Hoosier National Forest abuts Lake Monroe, which is a 10,750-acre reservoir created in 1964 by damming Salt Creek. The largest lake in Indiana, Lake Monroe serves as the *sole source* of drinking water for nearly 150,000 people in Bloomington, Indiana University, and other nearby communities. In addition to being an essential public health and environmental resource, Lake Monroe is also an important recreational and economic resource, attracting 1.5 million visitors each year and contributing more than $50 million to the local economy.

Lake Monroe is fed by three main tributaries: the North, Middle, and South Forks of Salt Creek. The entire Lake Monroe watershed spans 432 square miles and can be subdivided into four major sub-watersheds: the South Fork of Salt Creek, the North Fork of Salt Creek, the Middle Fork of Salt Creek, and the Lake Monroe Basin. Lake Monroe and its tributaries already suffer from significant water quality issues caused by pollution from nearby land uses, including nutrient overloading from agricultural and septic runoff and sedimentation from agricultural and forestry management activities in the watershed. Sediment in particular is a major concern for the watershed. Sediment carries the nutrients phosphorous and nitrogen as it moves through the watershed. These nutrients, in turn, promote eutrophic conditions and the incidence of harmful algal blooms, impairing the quality and safety of drinking water and diminishing recreational

use. Sediments are accumulating in Lake Monroe, entering the lake through its tributaries. A significant source of this sediment is soil erosion. Approximately 76% of the Lake Monroe watershed is considered highly erodible due to steep slopes and soil type, and erosion has been documented at 86% of observed stream sites within the watershed. *See* Forest Serv., Final SIR ("SIR" or "Final SIR") at 7, https://www.fs.usda.gov/project/?project=55119.

The pollution to Lake Monroe and its tributaries has resulted in a significant degradation of water quality. Indeed, Lake Monroe has been designated as "impaired" under the Clean Water Act due to taste and odor, algal blooms, and mercury in fish. *Id.* at 10. Relevant here, the South Fork of Salt Creek and one of its unnamed tributaries have also been designated as "impaired" due to "low dissolved oxygen and low biological communities." *Id.* The South Fork of Salt Creek also contributes the largest amount of nitrogen to Lake Monroe of any of its tributaries.

It is well-documented that higher levels of sedimentation and pollution of Lake Monroe and its tributaries increase the incidence of harmful algal blooms, which typically occur in warm summer months. *Id.* at 4, 6. The most serious risk from more frequent and more severe pollutant-induced algal blooms is that they often result in harmful ecological effects (e.g., decreased biodiversity), toxicity, and health impacts to humans exposed through drinking water or recreational activities. Each of the past eleven years, harmful algal blooms in Lake Monroe have led the state to issue public warnings about serious health symptoms, advising the public to exercise caution when engaging in recreational activities in Lake Monroe.

Algal blooms also substantially increase the difficulty and cost of treating Lake Monroe's water for use as drinking water and often leads to an increase in toxic disinfectant byproducts in the drinking water, which may impair public health and safety. These algal blooms are caused by a type of plankton called cyanobacteria, which have the potential to produce lethal—or sub-lethal

but nevertheless hazardous—toxins with serious health risks, especially as Bloomington and other municipalities must use higher volumes of chlorine to treat water from Lake Monroe to ensure its safety. Chemical interactions between that chlorine and cyanobacteria found in Lake Monroe leads to the presence of toxic byproducts (trihalomethane and haloacetic acid) in the water ultimately consumed by nearly 150,000 Hoosiers. In addition to trihalomethanes and haloacetic acids, there are more toxic unregulated chemicals that are produced when chlorine interacts with cyanobacteria, which are not yet regulated by the Environmental Protection Agency. The resulting long-term health impacts of these serious interactions are not yet known and will likely not come to light for years or decades due to the lag time in such studies.

The Project is located in the South Fork of Salt Creek sub-watershed, which is part of the larger Lake Monroe watershed. Thus, all streams in the Project area ultimately drain into Lake Monroe. The Project occupies 35.5% of the South Fork of Salt Creek sub-watershed. This sub-watershed in turn constitutes 102.4 square miles of the total 432 square miles of Lake Monroe's drainage area (or roughly 25%), and the Forest Service has found that the South Fork of Salt Creek contributes roughly 30% of the water that flows into Lake Monroe. The Forest Service is the single largest landowner in the Lake Monroe watershed. The Hoosier National Forest represents roughly 20% of the total acreage of the watershed, and constitutes over 40% of the South Fork of Salt Creek sub-watershed. National Forest land within the South Fork of Salt Creek sub-watershed is generally characterized by steep slopes with highly erodible soil.

Although the Forest Service takes various measures to mitigate the extent to which forestry practices cause sedimentation and contamination of waterways, the 2006 Forest Plan notes that "soil and water mitigation and protection measures" have only "moderate" reliability. 2006 Forest Plan at 4-7. No mitigation measure or management practice proposed by the Forest

Service is 100% effective (or remotely close thereto) in preventing sediment or other pollutant-dissolved runoff from entering streams that drain into Lake Monroe.

### C.   The Project: Burning, Logging, Herbicide Application, and Road Building

The Project includes clearcutting, commercial logging, and prescribed burning, which will impact 13,500 acres, or roughly 21 square miles, in the northern part of the Hoosier National Forest within the South Fork of Salt Creek sub-watershed, which drains into Lake Monroe and is in the portion of this sub-watershed that is located closest to Lake Monroe. The Project area includes very steep slopes in areas that will be subject to Project activities. The Forest Service's EA states that the slopes in the Project area are, at best, "moderately suited" to the use of timber harvest equipment and acknowledges that the steeper slopes in the Project area pose a "very severe" risk of erosion and are "poorly suited" to the use of timber harvest equipment. *See* Forest Serv., 2019 EA at 21-22, https://www.fs.usda.gov/project/?project=55119.

The Project will include repeated prescribed burns across as many as 13,500 acres. The Forest Service plans to burn an average of 1,500 acres, or 2.3 square miles, annually, and plans to burn the same areas repeatedly. These burns will require potentially hundreds of miles of fire lanes to be cleared to duff and bare soil throughout the Project area to manage and contain fire activities, and these activities will leave toxic ash and other hazardous byproducts on the ground that precipitation will then sweep into rivers or creeks that drain into Lake Monroe.

The Forest Service will also conduct clearcuts over 401 acres, and other forms of logging over another nearly 4,000 acres. These timber harvests will require the construction of 3.2 miles of new, permanent logging roads, 8.3 miles of new, "temporary" logging roads, the reconstruction of 4.9 miles of logging roads, and potentially hundreds of miles of trails and lanes

created by skidders and other heavy equipment to drag and carry heavy logs over thin soils (most of which will be on steep hillsides and sloping ground throughout the Project area).

Once commenced, the Project will last for up to two decades. The Forest Service anticipates that the clearcutting and other logging itself will take roughly 12 to 15 years to complete, while the Forest Service intends to conduct repeated prescribed burns in the Project area beginning this spring and continuing for the next 20 years (i.e., until 2043).

### D.    The Forest Service's Initial Decision and the Prior Litigation

In November 2018, the Forest Service issued a scoping notice for the Project. Plaintiffs and others submitted comments explaining the vital importance of Lake Monroe, the degraded nature of its water quality, and the fact that erosion and sedimentation—such as sedimentation associated with burning and timber harvesting—exacerbates the existing threats to the lake. They reiterated those concerns in comments on the agency's Draft EA. In November 2019, the Forest Service issued its Final EA. There, it asserted that the Project would not have any significant impacts. Relevant here, Plaintiffs objected to the agency's conclusion that the Project would not have any significant impact on the water quality of Lake Monroe but the Forest Service denied the objections, insisting that its analysis of impacts to Lake Monroe was sufficient.

In May 2020, Plaintiffs filed suit alleging various NEPA violations, including the failure to consider the impacts of the Project on Lake Monroe, particularly in light of the lake's degraded condition. Plaintiffs' lawsuit also alleged that the Forest Service failed to prepare an EIS to assess the significant impacts the Project will have on area resources, including the cumulatively significant impacts of the Project on water quality in the Lake Monroe watershed.

In March 2022, this Court resolved the parties' cross-motions for summary judgment. *See Monroe Cty. Bd. of Comm'rs v. U.S. Forest Serv.*, 595 F. Supp. 3d 713 (S.D. Ind. 2022).

Relevant here, the Court "agree[d] with Plaintiffs that [the Forest Service] failed to evaluate the potential impact of the [Project] on Lake Monroe." *Id.* at 723. In particular, the 2019 EA "failed to adequately consider or discuss the legitimate concerns the [Project] could have on Lake Monroe," the "sole source of drinking water for 120,000 people in southern Indiana." *Id.* This Court noted that although the 2019 EA "discuss[es] the possibility of sedimentation to the South Fork Salt Creek and the use of best practices to reduce negative impacts, there is no mention of the present concerns regarding Lake Monroe's water or how the [Project] may exacerbate these problems." *Id.* at 723-24. Because the Forest Service never analyzed these impacts in the first place, the agency "failed" to provide a "convincing statement of reasons" explaining why the impacts to Lake Monroe will not be significant and require an EIS. *Id.*

Accordingly, the Court concluded that the Forest Service "violated NEPA by failing to fully evaluate the environmental effects to Lake Monroe," and remanded this "portion of the decision" to the agency in order for the Forest Service to conduct the requisite "analysis consistent with federal law." *Id.* at 726. Implicit in the Court's remand were instructions both to analyze the Project's impacts to Lake Monroe in the first instance, and then to undertake a renewed evaluation of "critical factors that are essential to the decision to prepare an [EIS]," including the newly analyzed impacts to Lake Monroe in conjunction with other potentially significant factors that might warrant an EIS such as impacts to "unique characteristics . . . [like] the Knobstone Trail and portions of Lake Monroe's watershed," effects on "public health and safety," impacts to "the [endangered] Indiana bat," and "risks of the project [that] are both highly uncertain and controversial." *Id.* at 722-23. In other words, the Court did not resolve Plaintiffs' EIS claim, deferring that until further analysis by the Forest Service.

### E.      The Lake Monroe Watershed Management Plan

Two months before this Court issued its summary judgment ruling, Plaintiff Friends of Lake Monroe ("FLM")—which was not a party to the prior lawsuit—issued the first-ever, science-based Watershed Management Plan ("2022 WMP") for Lake Monroe, which identifies threats to Lake Monroe and provides action steps to address those threats over the next 20 years. *See* Friends of Lake Monroe, 2022 WMP, https://friendsoflakemonroe.org/watershed-plan/.

The "key to protecting and improving water quality in the lake is to keep pollutants . . . from reaching the streams that flow into Lake Monroe." *Id.* at xv. The 2022 WMP calculated the current and target loads for the main pollutants in the watershed: sediment, nitrogen, and phosphorous. "Based on these target loads, significant reductions are required." *Id.* at 140-41. Total phosphorus loads must be reduced by 80%, total nitrogen loads must be reduced by 20%, and total sediment loads must be reduced by 41%. *Id.* The South Fork of Salt Creek sub-watershed "is the most impaired and therefore has the most opportunity for improvement." *Id.* at 142. Within that sub-watershed, phosphorus loads must be reduced by 86%, nitrogen loads must be reduced by 47%, and sediment loads must be reduced by 60%. *Id.* at 142-43.

The WMP recognizes that "[o]ver 82% of the Lake Monroe watershed is forested and forestry management activities such as logging, burning or herbicide application may have a negative impact on water quality." *Id.* at 129, 135, 148. The WMP thus establishes goals of "[m]aintain[ing] forested land within the watershed as forested land" and "[m]inimiz[ing] impacts to water quality from forest management." *Id.* at 148.

### F.      The Forest Service's Draft SIR

On October 6, 2022, rather than prepare a supplemental EIS or EA in accordance with NEPA and this Court's summary judgment order, the Forest Service instead issued a draft SIR

for the Project and accepted public comment for 30 days. *See* Forest Serv., Draft SIR, https://www.fs.usda.gov/project/?project=55119. Plaintiffs Monroe County and FLM requested an extension of the 30-day comment period to provide sufficient time to review and comment on the draft SIR, but the Forest Service summarily denied those requests.

The draft SIR is intended to "address [this Court's] ruling that the Forest Service violated [NEPA] by 'failing to fully evaluate the environmental effects to Lake Monroe'" from the Project. *Id.* at 2. It characterizes this Court's prior order as requiring the agency merely to offer further "expla[nation]" as to "why the impacts to Lake Monroe would not be significant." *Id.* The Forest Service did not acknowledge this Court's ruling that the 2019 EA failed to conduct a NEPA-compliant analysis of the Project's impacts to Lake Monroe in the first instance.

The draft SIR touts the Forest Service's previous engagement with Plaintiff FLM and "substantial financial investments into the Monroe watersheds and the South Fork Salt Creek watersheds for restoration efforts." *Id.* at 11. However, the draft SIR does not explain the relevance of those past efforts to the Forest Service's examination of the direct, indirect, and cumulative impacts to Lake Monroe's water quality that will result from *this* Project. In other words, rather than considering and adopting Project alternatives that would eliminate or at least reduce effects to Lake Monroe—for example, by avoiding burning and logging within certain buffer zones, or undertaking Project activities on national forest lands outside the Lake Monroe watershed—the Forest Service merely applauded itself for helping develop the 2022 WMP.

Despite the lack of any meaningful, forward-looking analysis related to this Project, the draft SIR concludes with "a high level of confidence" that the Project "will not add to the impairments of the Lake Monroe watersheds." *Id.* at 11, 24. In support of this assertion, the draft SIR contends that "mitigation actions" incorporated into the Project, including the prohibition on

15

harvesting within the 100-year floodplain, the use of riparian buffers around headwater streams, and the implementation of erosion control best management practices ("BMPs"), "have been shown to be highly effective in protecting water quality and exceed those recommended by the Lake Monroe [WMP]." *Id.* at 24. However, the draft SIR—like the 2019 EA—does not provide any quantitative or qualitative analysis to support this conclusory, counterintuitive assertion.

Although the draft SIR acknowledges that sedimentation from shoreline erosion is a "major concern[]" for Lake Monroe, and further acknowledges that forest management activities such as timber harvesting and prescribed burning can contribute to increased sedimentation, the draft SIR insists that the implementation of BMPs will "confine sediment within the Project area, preventing it from reaching Monroe Lake." *Id.* at 23. As a result, the draft SIR asserts that the Project will "not add to the problem that Lake Monroe faces due to erosion." *Id.* at 7.

The draft SIR insists that monitoring will ensure the efficacy of BMPs at "minimizing short-term impacts on the soil and water resources and maintain[ing] or enhanc[ing] long-term productivity, water quantity, and water quality." *Id.* at 17. Yet the draft SIR reports that a mere four sites within the massive 23-square-mile Project area are being monitored for turbidity, which can "indicate increased sedimentation during soil disturbing projects." *Id.* at 18.

Plaintiffs submitted severe comments on the draft SIR's questionable analysis and assertions. For example, Plaintiff FLM supplied detailed science-based comments criticizing the Forest Service's attempt to downplay the Project's future impacts on Lake Monroe by touting the agency's unrelated prior support of FLM's efforts to improve water quality, as well as the Forest Service's reliance on FLM's WMP. According to FLM, the Forest Service cannot escape the fact that the Project will have "highly significant impacts . . . on Lake Monroe," which will work against the WMP's efforts to improve Lake Monroe's degraded water quality. FLM, *Draft SIR*

16

*Comments* (Nov. 6, 2022) ("Ex. 1") at 1. For instance, while the WMP "specifically calls for reducing sediment and nutrient pollution," the Project "will do the opposite by removing significant vegetation in the Lake Monroe watershed that would otherwise safeguard against erosion and sedimentation, and by burning vast swaths of forested lands that will contribute burnt sediment, toxic ash, and other harmful fire byproducts to Lake Monroe." *Id.* at 2.

FLM's comments also identified factual errors and methodological flaws that undermine the draft SIR's discussion of the Project's effects on Lake Monroe. For example, FLM criticized the SIR's attempts to downplay the Project's significant impacts on the watershed by insinuating that agriculture is in fact the main driver of water quality degradation. As FLM's comments explain, this suggestion is contradicted by the facts: "both the South Fork and North Fork [of Salt Creek] are dominated by forested land and . . . are major contributors of [p]hosphorus, [n]itrogen, and sediment to Lake Monroe." *Id.* at 3. Indeed, FLM's own WMP shows that "erosion from disturbed steep slopes—as will occur from the [Project]—is a contributor to water quality degradation" within the watershed. *Id.*; *see also id.* (refuting the draft SIR's assertion that "[n]one of the streams in the [P]roject area are impaired from siltation, algae growth, or nutrients," because "as a matter of basic hydrology, [] low dissolved oxygen often occurs due to an excess of nutrients, which in turn stimulates primary production and depletes oxygen").

FLM's comments provided concrete factual evidence disputing the draft SIR's conclusion that the use of BMPs can eliminate the "threats to water quality from the proposed extensive logging and burning" and "bring the level of impacts to Lake Monroe below the threshold of 'significance'" as defined by NEPA. *Id.* at 1. The best available science proves that while the such measures may *reduce* threats, "the only way to genuinely ensure that there will be no significant impacts . . . is to leave the forest intact and forgo logging and burning in the Lake

17

Monroe watershed." *Id.* at 3-4. The draft SIR also "ignore[s] the ineffectiveness of prior

mitigation efforts" by the Forest Service "involving BMPs comparable to those proposed here."

*Id.* at 4. The well-documented failure of the very BMPs that Forest Service relies upon to justify

its determination that the impacts to Lake Monroe from *this* Project will be insignificant

"demonstrate that the [Project] is proposed in an area that is unsuitable for logging, burning or

road and trail-building." *Id.* at 9. The historical ineffectiveness of BMPs likewise demonstrates

that "these activities, as proposed, have a high probability of causing sediment and nutrient

pollution in Lake Monroe." *Id.* FLM thus "urge[d]" the agency to prepare an EIS. *Id.* at 10.

Other Plaintiffs, including the Indiana Forest Alliance ("IFA"), also submitted comments

raising detailed, science-based comments sharply critiquing the Forest Service's draft SIR. IFA

contends that the Forest Service's assertion that Project activities are "too far from Lake Monroe

to negatively affect the Lake defies basic science." IFA, *Draft SIR Comments* (Nov. 7, 2022)

("Ex. 2") at 2. Indeed, forest management activities such as logging, prescribed burning, and

road building are known to cause high levels of sediment runoff, particularly when conducted on

steep ground with highly erodible soils—i.e., the exact circumstances presented here. *Id.* at 2, 6,

9. IFA stressed that "[t]here is no scientific basis to assume that sediment and nutrients" in runoff

from the Project area "will settle out of the water column . . . before it reaches Lake Monroe." *Id.*

at 2-3. Indeed, the draft SIR "is silent on the potential for increased stream bank erosion from

[the Project] even though such erosion is a normal impact of timber harvesting operations

including harvests like this one," even when undertaken with BMPs. *Id.* at 5-6.  IFA also pointed

out a basic inconsistency, explaining that "the statement in the Draft SIR on page 21 that

'eroding trails, roads and undersized culverts are contributing sediment to the South Fork

watershed, and ultimately Lake Monroe, and need to be repaired,' plainly indicates that the

[Forest Service] knows that sediment from activities in the Houston South Project area *will* reach the Lake Monroe water supply. Wearing blinders and pretending as if *this* sediment is somehow different from other sediment in these watersheds is illogical, irrational, and arbitrary." *Id.* at 3.

IFA also provided detailed discussion of peer-reviewed studies demonstrating that even with the implementation of BMPs, statistically significant increases in pollutants, such as nitrogen and sediment, occur in watersheds that are logged compared to those that remain uncut. *Id.* at 3-6. For example, IFA's comments described one study showing that, even with the implementation of BMPs, increased runoff, streambank erosion, and heightened sedimentation occurred in streams draining logged watersheds for years after logging concluded. *Id.* That study also demonstrated that the statistically significant increase in the discharge of nutrients from areas logged using BMPs was nearly as high as the discharge from areas logged without using BMPs. *Id.* Thus, contrary to the Forest Service's assertion that BMPs "eliminate" the pollution problem," the best available science demonstrates that the implementation of BMPs does not reduce nutrient loading much below levels from logging without BMPs. *Id.*

IFA's comments likewise criticize the draft SIR's assertion that "fire monitoring data shows that prescribed burning has no effect on soil and water resources." *Id.* at 6-8. IFA noted that in light of the Project area's terrain—i.e., steep slopes with thin soils prone to erosion even without human intervention—the draft SIR's assertion that a "thick duff layer" will remain "post-burn [and] prevent[] soil displacement until the area re-vegetates" is inaccurate. *Id.* IFA then evaluated studies concluding that prescribed burns significantly increase both rainfall runoff and sedimentation levels in affected watersheds, which in turn degrades water quality. *Id.*

IFA also pointed out that repeated burning on more than 2,000 acres in the northwestern portion of the Project area will produce polluted runoff on steep slopes draining into three large

streams that enter the South Fork of Salt Creek downstream from the Project's farthest monitoring point. *Id.* at 13. Yet the runoff from repeated prescribed burns undertaken 2-3 times on approximately four square miles of steep national forest land north of the Maumee Boy Scout Reservation will not even be monitored, thereby allowing significant levels of suspended sediment and nutrients to reach the South Fork of Salt Creek and Lake Monroe without the Forest Service monitoring to even discover (let alone quantify) the problem. *Id.*

### G.     The Agency's Final SIR and Decision

On December 5, 2022, the Forest Service issued a final SIR. The SIR's cover letter takes the view that the SIR brings the agency's decision into legal compliance. *See* Forest Serv., *Cover Letter* (Dec. 5, 2022), https://www.fs.usda.gov/project/?project=55119. In particular, the agency asserts that the final SIR "clarified and updated relevant portions of the existing project record with additional information, analysis, and context responsive to the Court's ruling." *Id.* at 2. According to the agency, "consideration of the information contained, and incorporated by reference, in the Final SIR addresses the Court's ruling by fully evaluating environmental effects to Lake Monroe from the [Project]." *Id.* The cover letter also sets forth the Forest Service's "decision" that a "correction, supplement, or revision to the [Project] EA is not necessary." *Id.*

In all pertinent respects, the final SIR mirrors the draft SIR. The SIR and cover letter declined to respond to public comments that were critical of the Forest Service's assessment of impacts to water quality. According to the SIR, "the information received from those who still did not support the project, raised concerns that had been previously addressed in the EA and project record and no further information or clarification was needed." *Id.* The agency thus refused to consider, and failed to respond, to the highly relevant comments, scientific studies, methodological concerns, and other critiques submitted during the public comment period. Yet

20

the Forest Service did not notify the Court of its purported compliance with the Court's prior

summary judgment order; rather, it announced its plans to hurriedly commence Project activities

in April 2023 (thereby forcing Plaintiffs to file this preliminary injunction motion). The

following map illustrates the Project activities that the Forest Service will undertake in 2023, if

this Court does not maintain the status quo through injunctive relief.



## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v.*

*Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). Courts "apply a sliding scale approach in which the more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor. *Cook Cty., Ill. v. Wolf*, 962 F.3d 208, 234 (7th Cir. 2020). As explained below, all of these factors weigh heavily in favor of maintaining the status quo until the Court can decide the case on the merits.

## I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

The Forest Service's SIR flouts NEPA and its implementing regulations in several ways. Thus, Plaintiffs are likely—indeed, virtually certain—to prevail on the merits.

### A.     The Forest Service's Failure to Prepare an EIS or EA Is Unlawful

At the most fundamental level, the Forest Service violated NEPA by preparing an SIR— i.e., a non-NEPA document—despite the facts that this Court invalidated the November 2019 EA and that most of the information analyzed in the SIR existed when the agency prepared its legally defective EA. Because an SIR can never substitute for a supplemental EIS or EA, nor replace a legally deficient EIS or EA, Plaintiffs are almost certain to prevail on this claim.

Courts have repeatedly rejected the Forest Service's use of SIRs in contexts like this one. For example, the Ninth Circuit rebuffed the Forest Service's use of an SIR where the agency was "not using the SIRs wholly for the purpose of evaluating the significance of new information or changed circumstances," but rather "to present information and analysis that it was required, but according to the finding of the district court, failed to include in its original NEPA documents." *Idaho Sporting Cong. v. Alexander*, 222 F.3d 562, 566-67 (9th Cir. 2000). That court held that "[t]he Forest Service knew or should have known that it needed to provide this information and analysis at the time it prepared the original EAs"; "[i]t is inconsistent with NEPA for an agency to use an SIR, rather than a supplemental EA or EIS, to correct this type of lapse." *Id.* at 567.

The court explained that the harm is far from academic—"the SIRs were prepared in response to litigation, years after the original decisions to approve the timber sales were made"; "although the public was given an opportunity to comment on the SIRs, the Forest Service's decision making process was not formally reopened and no administrative appeal of the SIRs was permitted." *Id.* at 568. In turn, the court held that "[t]he SIRs therefore do not remedy the fact that at the time the Forest Service originally approved the timber sales, it did not have available all the information and analysis . . . it was required to consider" under NEPA. *Id.*

Courts have uniformly endorsed this approach. *See, e.g.*, *Or. Natural Res. Council v. U.S. Forest Serv.*, 293 F. Supp. 2d 1200, 1209 (D. Or. 2003) (rejecting use of an SIR where, despite prior EAs, "[i]t is undisputed that the Forest Service has never issued NEPA documents for these timber sales that disclose or analyze its survey" data even though this "is information that should be available prior to the issuance of a NEPA document and should be used for formulating a range of alternatives, evaluating effects, and decision making"); *Olympic Forest Coal. v. U.S. Forest Serv.*, 556 F. Supp. 2d 1198, 1205-08 (W.D. Wash. 2008) (rejecting use of an SIR after the court invalidated the original EA, and stating that "[t]his is not a case where the Forest Service is faced with new information or changed circumstances"); *Swan View Coal. v. Weber*, No. 13-cv-129, 2016 WL 160654, at *5-6 (D. Mont. Jan. 13, 2016) (rejecting an SIR because "it was arbitrary and capricious for the Forest Service to not prepare a supplemental EA" where the SIR relied upon "information that should have been in the original EA but was not").

This case fits squarely within *Idaho Sporting Congress* and progeny. Here, the Court found that the Forest Service's 2019 EA violated NEPA by failing to take a hard look at the Project's serious health, safety, recreational, and environmental impacts to Lake Monroe. *See Monroe Cty.*, 595 F. Supp. 3d at 723-24. Because this rendered the 2019 EA unlawful, the

23

Project cannot go forward in harmony with NEPA absent a new (or supplemental) EIS or EA. Rather than prepare an EIS or EA, however, the agency instead hastily prepared a *non-NEPA* document (an SIR) so it could rush to start the Project without first even notifying the Court.

In so doing, the Forest Service relied primarily on information that was available to the agency prior to its 2019 EA, rather than exclusively on new information post-dating the agency's prior decision. But this is not the purpose of an SIR, which can *only* be used to consider the import of genuinely new information to determine its significance under NEPA. Thus, the Forest Service violated NEPA and this Court's order by preparing an SIR instead of an EIS or EA, thereby excluding Plaintiffs and the public from the legally required EIS or EA process and the administrative appeal process required when Forest Service decisions are reopened in this manner. *See Idaho Sporting Cong.*, 222 F.3d at 567 ("It is inconsistent with NEPA for an agency to use an SIR, rather than a supplemental EA or EIS, to correct this type of lapse.").[3]

Accordingly, Plaintiffs have easily met their burden to demonstrate a likelihood of success on their claim that the Forest Service violated NEPA by failing to prepare an EIS or EA.[4]

---

[3] Examples of information analyzed for the first time in the 2022 SIR despite being available to the Forest Service at the time of the 2019 EA are: the pre-existing degraded condition of Lake Monroe due to forest management and other activities, the well-documented failure of BMPs to reduce (let alone eliminate) sediment and pollutant runoff into watersheds, and the health and safety impacts of introducing additional sediment and other pollutants into Lake Monroe.

[4] Although NEPA is procedural, the fallout from preparing an SIR (instead of an EIS or EA) is far from harmless. *See Friends of the Clearwater v. McAllister*, 214 F. Supp. 2d 1083, 1089 (D. Mont. 2002) (rejecting use of an SIR and explaining that "[i]f the agency does not follow the requirements of law procedurally, then its substantive decision-making is jeopardized"); *Or. Natural Res. Council*, 293 F. Supp. 2d at 1209 (noting that where an SIR analyzes pre-existing information that an agency failed to analyze in its original EAs, it demonstrates precisely why the "underlying EAs are legally deficient" because the prior EAs could not have "properly frame[d]" the issues, "analyzed a range of alternatives based on" all relevant information, or ensured the agency "had all of the proper information before it before allowing logging").

### B.       The Failure to Respond to Comments Violates NEPA and the APA

Even if Plaintiffs were not virtually certain to prevail on their SIR challenge, they would

prevail for other reasons. For instance, the Forest Service entirely disregarded—and failed even

to respond to—highly detailed, science-based comments from FLM, IFA, and others that called

into serious question essentially every aspect of the agency's SIR, including its conclusory

assertions, factual inconsistencies, major methodological flaws, lack of supporting scientific

evidence, and unsubstantiated conclusions. *See supra* at 16-21.

It is a bedrock APA principle that agencies soliciting public comment must engage with,

and respond to, those comments. *See, e.g.*, *Del. Dep't of Nat. Res. v. EPA*, 785 F.3d 1, 13-16

(D.C. Cir. 2015) (holding that where "petitioners presented their concerns" about an action but

the agency "did not[] respond properly to their well-founded concerns," the "action [i]s arbitrary

and capricious on that ground alone"); *id.* (further rejecting the agency's explanation that it

"heard" the complaints because "merely hearing is not good enough [and instead the agency]

must respond to serious objections."); *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1157 (D.C.

Cir. 2011) (holding that an agency must address "relevant and significant public comment[s] . . .

, lest its action be arbitrary and capricious"); *Allied Loc. & Reg'l Mfrs. Caucus v. U.S. E.P.A.*,

215 F.3d 61, 80 (D.C. Cir. 2000) ("For an agency's decision making to be rational, it must

respond to significant points raised during the public comment period.").

Likewise, NEPA also requires responses to comments. *See* 40 C.F.R. §§ 1503.4,

1502.9(c). One purpose of NEPA is for agencies to "face those stubborn, difficult-to-answer

objections without ignoring them or sweeping them under the rug." *Sierra Club v. U.S. Army

Corps of Eng'rs*, 772 F.2d 1043, 1049 (2d Cir. 1985). Courts have repeatedly rejected agency

attempts to ignore substantive comments, especially where those concerns come from subject

matter experts. *See, e.g.*, *W. Watersheds Proj. v. Kraayenbrink*, 632 F.3d 472, 492-93 (9th Cir.

2011) ("When an agency . . . submits proposed regulatory changes for public comment and then

offers no meaningful response to serious and considered comments by experts, that agency

renders [NEPA's] procedural requirement meaningless[.]"); *Pac. Coast Fed'n of Fishermens*

*Ass'ns v. Nat'l Marine Fisheries Serv.*, 482 F. Supp. 2d 1248, 1255 (W.D. Wash. 2007) (finding

NEPA violation where "dissenting views were not disclosed and discussed at the appropriate

point, nor with sufficient depth, to inform decision-makers of the full range of responsible

opinion on the environmental effects"); *Seattle Audubon Soc'y v. Moseley*, 798 F. Supp. 1473,

1482 (W.D. Wash. 1992) ("NEPA requires that the agency candidly disclose . . . the risks of its

proposed action, and that it respond to the adverse opinions held by respected scientists.").

 This case is no different. The Forest Service solicited public comment on its draft SIR,

received detailed science-based comments from subject matter experts on forest and water

quality issues, but failed to respond to those comments (let alone modify the SIR). *See supra* at

16-21. Perhaps most egregious is the agency's assertion that the only comments received were

"from those who still did not support the project, rais[ing] concerns that had been previously

addressed in the EA." Cover Letter at 2. In reality, there were many new substantive comments

(including by FLM that was not a plaintiff in the prior lawsuit) related both to facts known to the

Forest Service before the 2019 EA and to new facts such as the 2022 WMP for Lake Monroe.

Thus, not only did the Forest Service violate NEPA and the APA by failing entirely to respond to

comments, but even its reason for doing so is irrational, factually inaccurate, and arbitrary.

### C.    The SIR's Assertions and Conclusions Are Arbitrary and Capricious

By resting in the final SIR on unsupported assertions and conclusions made initially in

the draft SIR—rather than engaging with the robust, science-based objections presented by

subject matter experts—the Forest Service acted arbitrarily and capriciously.

Agencies may not ignore "relevant factor[s]" or "important aspect[s] of the problem."

*State Farm*, 463 U.S. at 43. Nor, when presented with credible information calling into question

an agency's analysis or conclusions, may the agency merely disregard such information. Rather,

once evidence is presented that "casts serious doubt upon the reasonableness of an agency's

conclusions," "NEPA then places the burden on the agency to come forward with a well-

reasoned explanation" and response that "must be convincing." *Nat'l Parks & Conservation*

*Ass'n v. Babbitt*, 241 F.3d 722, 736 (9th Cir. 2001) (collecting cases) (citations omitted); *see also*

*Am. Wild Horse Pres. Campaign v. Zinke*, No. 16-cv-1, 2017 WL 4349012, at *10 (D. Idaho

Sept. 29, 2017) ("NEPA demands that" agencies "discuss the science upon which the agency's

decision is based as well as disclose and respond to evidence weighing against its decision.").

Here, the SIR is an exercise in incoherence. It fails to mention—let alone respond to—the

detailed, substantive critiques casting serious doubt on essentially every aspect of the Forest

Service's SIR. Setting that glaring problem aside, the SIR is illogical on its own. Despite

acknowledging that "[t]opography in the Lake Monroe watershed is characterized by steep hills"

and that "[s]teep slopes on much of the forested land exist in the South Fork Salt Creek

watershed," SIR at 10, and notwithstanding the SIR's concession that *other* activities comparable

to those authorized as part of the Project "are currently contributing sediment to the South Fork

of Salt Creek watershed, and ultimately Lake Monroe," *id.* at 21, the Forest Service insists,

without any substantiation, that burning, logging, herbicide application, and road building in

27

*thousands of acres* of steep, highly erodible slopes will not contribute *any* sediment or other pollutants to Lake Monroe. *Id.* at 7 ("Sedimentation from project activities will be contained and will not reach Monroe Lake."); *id.* at 24 (stating with "a high level of confidence that the [Project] will not negatively impact the water quality" of Lake Monroe). As commenters noted, these patently arbitrary and internally inconsistent conclusions defy not only basic scientific principles, but also any notion of common sense. *See* Ex. 1 at 1-10; Ex. 2 at 2-9.

Likewise, despite extensive evidence and scientific studies calling into question the efficacy of BMPs (including the specific BMPs adopted by the Forest Service as part of the Project) in reducing—let alone eliminating—sediment and other pollutants entering the watershed when burning and logging on comparably steep terrain, *see supra* at 17-19, the Forest Service continues to insist that the same BMPs will be 100% effective here and will confine sediment to the Project area. *See* SIR at 7, 23. Such illogical assertions, flying in the face of objective scientific evidence and rudimentary principles, cannot form the basis of rational decisionmaking and constitute arbitrary and capricious agency action.[5]

By failing to address rigorous, science-based objections and instead doubling down on the agency's conclusory assertions, the Forest Service ignored relevant factors, entirely failed to consider important aspects of the problem, and offered explanations that run counter to the evidence before the agency, in violation of NEPA and the APA. *State Farm*, 463 U.S. at 43.

---

[5] These are but two examples of many arbitrary, unexplained, or unsupported assertions that undermine the integrity of the SIR's conclusions, which Plaintiffs intend to pursue in more detail at summary judgment. Other examples include, for instance, the fact that the Forest Service will only monitor for turbidity in four locations, but they are *all* upstream of large sloped areas that will be burned and logged, draining into the South Fork of Salt Creek and then Lake Monroe without any monitoring regime to discover (or quantify) the problem. *See supra* at 19-20.

## II.   PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION

"The likelihood of success on the merits is an early assessment of the quality of the underlying lawsuit, while the likelihood of irreparable harm takes into account how urgent the need for equitable relief really is." *Mich. v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011). While irreparable harm must be "likely" for "preliminary relief to be granted," "the alleged harm need not be occurring or be certain to occur before a court may grant relief." *Id.*

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). This is especially true in NEPA cases because "the lack of an adequate environmental consideration [under NEPA] looms as a serious, immediate, and irreparable injury." *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 157 (D.C. Cir. 1985). "[T]he risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation"; "[t]he difficulty of stopping a bureaucratic steam roller, once started, [] seems to us, . . . a perfectly proper factor for a district court to take into account in assessing that risk, on a motion for a preliminary injunction." *Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir. 1989) (Breyer, J.); *see also W. Watersheds Proj. v. Zinke*, 336 F. Supp. 2d 1204, 1240 (D. Idaho 2018) ("Federal courts elsewhere have held, sensibly in this Court's view, that 'bureaucratic momentum' can support an argument of irreparable harm.").

Based on these principles and the Seventh Circuit's sliding scale approach—and in light of Plaintiffs' very high likelihood of success on the merits—Plaintiffs have easily demonstrated that their concrete interests in using specific areas of the Hoosier National Forest and Lake Monroe will likely be irreparably harmed by the Project's activities that will degrade, impair, and materially alter the condition and quality of these areas for many decades. *See* Decl. of Jeff Stant

29

("Ex. 3"); Decl. of Dr. Sherry Mitchell-Bruker ("Ex. 4"); Decl. of Dr. Julie Thomas ("Ex. 5"). Here, Plaintiffs provide a few representative examples of these irreparable injuries, which are explained in extensive detail in the accompanying declarations.

It is well-established that prescribed burns and/or logging in national forest parcels used by plaintiffs constitutes irreparable harm to their interests. *See, e.g.*, *All. for the Wild Rockies v. Pierson*, 550 F. Supp. 3d 894, 905 (D. Idaho 2021) (enjoining "logging, burning, road and trail construction" that would harm plaintiffs' "ability to view, experience, and utilize the areas in an undisturbed state," their "interests in the naturally functioning ecosystems of the Forest and the Project area," and "their interests in looking for, viewing, studying, and enjoying . . . wildlife species undisturbed in their natural surroundings"); *Native Ecosystems Council v. Mehlhoff*, No. 20-cv-19, 2020 WL 3969343, at *5-6 (D. Mont. July 6, 2020) (enjoining prescribed burns where they would cause "the destruction of specific wildlife habitat in that area" regularly used by the plaintiffs to view wildlife); *Habitat Educ. Ctr. v. Bosworth*, 381 F. Supp. 2d 842, 863 (E.D. Wis. 2005) (finding irreparable harm where "the Forest Service plans to harvest within or near goshawk, red-shouldered hawk, and marten habitat and that some of this harvesting will negatively affect such habitat and the species"); *Buckeye Forest Council v. U.S. Forest Serv.*, 337 F. Supp. 2d 1030, 1039 (S.D. Ohio 2004) (enjoining "tree cutting, thinning, logging, and prescribed burning" so the court was not "powerless to further examine the merits of Plaintiffs' claims because the trees will have already been cut down").

These are the same, detailed injuries Plaintiffs allege here with respect to the specific parcels in which the Forest Service will burn, log, apply herbicides, and build roads absent an injunction. *See* Ex. 3 ¶¶ 8-29 (explaining in detail the concrete, irreversible harms to IFA members' interests in the specific parcels that will be forever altered by the Project, as well as

their interests in rare wildlife, recreation, and solitude in these specific areas); Ex. 5 ¶¶ 3, 5, 7, 8. The fact that, unless enjoined, the Project will prevent Plaintiffs from using and enjoying *these* 3,500 acres of deep importance to them is, by definition, irreparable harm. *See, e.g.*, *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (finding irreparable harm where "the Project will harm [plaintiffs'] members' ability to 'view, experience, and utilize'" "1,652 acres of the forest" even though they could still use "other areas of the forest"). This alone establishes the likelihood of irreparable harm in the absence of an injunction.

The likelihood of irreparable harm is more obvious here than in the ordinary burning or logging case. The Project will also cause irreparable harm—i.e., imminent harm that cannot be remedied by money damages—to Plaintiffs' interests in Lake Monroe's water quality and in protecting public health and safety. Absent an injunction, the Project will inject significant amounts of new sediment, toxic ash and other prescribed burn byproducts, and pollutants into the already federally "impaired" Lake Monroe, which cannot be removed once those pollutants enter the reservoir, settle to the bottom, and further exacerbate the lake's already degraded water quality. *See* Ex. 4 ¶¶ 9-16; Ex. 5 ¶¶ 4, 6. After entering Lake Monroe, dissolved pollutants become "legacy" pollutants that then exacerbate algal blooms and other water quality issues for decades. *See* Ex. 4 ¶ 15. Those algal blooms threaten serious short-term and long-term health issues for recreational (and pet) users of Lake Monroe. *See* Ex. 4 ¶¶ 9-13; Ex. 5 ¶¶ 5-6, 8.

Moreover, because Lake Monroe is the sole drinking water source for nearly 150,000 people, the Project's significant additional contribution of pollutants will likely cause serious taste and odor concerns, and even more troublingly will require municipalities to add significantly higher levels of chlorine and other chemical disinfectants to water to make it safe and potable, as explained in the 2022 WMP, which further threatens public health by increasing

the risk of toxic, disinfectant byproducts in the water ultimately used and consumed by nearly 150,000 Hoosiers. *See* Ex. 4 ¶¶ 11-12; Ex. 5 ¶¶ 6, 8.

Although the long-term effects of these algal blooms and their consequences are not completely known, courts routinely find dire health, safety, and water quality concerns of this kind sufficient to constitute irreparable injury, especially where an already degraded water supply is at stake. *See, e.g.*, *Cook Cty.*, 962 F.3d at 234 (enjoining agency rule that plaintiffs alleged would result in "potentially dire public health consequences" because "the public interest is better served for the time being by" enjoining the rule); *Wilderness Soc'y v. Bosworth*, 118 F. Supp. 2d 1082, 1115 (D. Mont. 2000) (enjoining logging project where "Plaintiffs' claims regarding water quality involve a project area in which the Defendants admit the . . . standards for water quality are already being violated"); *cf. Mich.*, 667 F.3d at 788-89 (finding irreparable harm if Asian carp reach Lake Michigan because "the dire nature of the harm posed by the carp and their close proximity" to the lake, once caused, is "difficult—if not impossible—to reverse").

In light of the irreversible harms to Plaintiffs' recreational, wildlife, water quality, public health, and safety interests in Lake Monroe's water and affected parcels of the Hoosier National Forest, Plaintiffs have amply demonstrated a likelihood of irreparable harm if the status quo is not maintained through a preliminary injunction.

## III.   THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST TIP SHARPLY IN FAVOR OF PRELIMINARY INJUNCTIVE RELIEF

When an environmental injury is alleged, "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Gambell*, 480 U.S. at 545. This is certainly true in this case, for several reasons.

Under controlling authority, "[i]t is an accepted equitable principle that a court does not have to balance the equities in a case where the defendant's conduct has been willful." *Envtl.*

32

*Prot. Agency v. Envtl. Waste Control, Inc.*, 917 F.2d 327, 332 (7th Cir. 1990). Here, the Forest Service's actions can only be described as willful. After this Court held that the agency's 2019 EA violated NEPA, the Forest Service neither prepared a new EIS or EA, nor even notified the Court of its (mistaken) view that the agency had satisfied the Court's remand order. It did so despite a history of preparing SIRs in analogous contexts only to have courts uniformly reject the agency's attempts to circumvent NEPA in this way. Given the agency's flagrant disregard for NEPA and its mandate for well-informed decisionmaking before taking action that will result in grave environmental, health, and safety consequences, no equitable balancing is necessary.

Even if the Court engages in equitable balancing, it is not a close call. On the one hand, Plaintiffs have alleged—on the basis of the best available science—significant, irreparable harms that this Project is likely to inflict once the Forest Service begins burning, logging, applying herbicides, and building roads and trails in thousands of acres of Indiana's only national forest.

On the other hand, the Forest Service has no legitimate equitable argument for needing to commence this Project prior to a ruling on the merits of the case. Indeed, the Forest Service waited *14 years* from its issuance of the 2006 Forest Plan to authorize this Project, thereby undercutting any argument that this Project is so urgently needed that it cannot await merits resolution. And, to the extent that the agency asserts this Project has been delayed since 2020 due to litigation, any such harm is due solely to the Forest Service's own failure to adhere to NEPA. As the Seventh Circuit has explained, "the specter of further delay cannot in itself justify setting aside the mandate of the law" where an agency "fail[s] to comply with the most basic terms of NEPA"; [i]f fault must be found, it lies with those who refused to consider patently reasonable alternatives and who ignored the explicit directions of the federal bench." *Simmons v. U.S. Army*

*Corps of Eng'rs*, 120 F.3d 664, 670 (7th Cir. 1997). Here, any fault or delay associated with the agency's failure to commence the Project to date lies exclusively with the Forest Service.

Granting a preliminary injunction—which would allow the Court to maintain the status quo pending a fuller examination of the issues—also serves several important public interest objectives. First, it would preserve and promote water quality, national forest resources, public health, and safety. *See All. for the Wild Rockies v. Wood*,. No. 07-cv-452, 2008 WL 2152237, at *2 (D. Idaho May 21, 2008) ("[T]he public's interest in preserving precious, unreplenishable resources must be taken into account in balancing the hardships."); *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 326-27 (D.C. Cir. 1987) (affirming district court's finding that an injunction was in the public interest to "protect against further illegal action pending resolution of the merits" and to "protect[] the environment from any threat of permanent damage").

Second, especially where environmental laws are at stake, there is a "strong public interest in meticulous compliance with the law by public officials." *Fund for Animals v. Espy*, 814 F. Supp. 142, 152 (D.D.C. 1993); *see also Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 26 (D.D.C. 2009) ("There is no question that the public has an interest in having Congress' mandates in NEPA carried out accurately and completely."); *Habitat Ctr.*, 381 F. Supp. 2d at 864 ("[I]t is not even arguable that violations by federal agencies of NEPA's provisions as established by Congress harm the public as well as the environment."); *Siskiyou Regional Educ. Proj. v. Goodman*,. No. 04-cv-3058, 2004 WL 1737738, at *13 (D. Or. Aug. 3, 2004) (enjoining logging and finding that "the public interest is not served if the project goes forward in violation of" environmental laws).

Accordingly, the equites and public interest also counsel strongly in favor of a preliminary injunction to maintain the status quo pending resolution of the merits.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enjoin all Project activities to maintain the status quo until the Court can resolve this case on the merits, so that the Forest Service does not "act on incomplete information, only to regret its decision after it is too late to correct." *Marsh v. Or. Natural Res. Council*, 490 U.S. at 371.[6]

<div style="margin-left: 50%;">

Respectfully submitted,

*/s/ William S. Eubanks II*
William S. Eubanks II
Eubanks & Associates, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(970) 703-6060
bill@eubankslegal.com

*Counsel for Plaintiffs*

</div>

---

[6] Should the Court issue an injunction, Plaintiffs—a county and three nonprofit organizations—respectfully request that the Court not require a bond or impose only a nominal bond. Because of their chilling effect on litigation to protect the environment and public health, courts often dispense with a security bond for public interest plaintiffs, or require only a nominal bond. *See Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972) (ordering no bond); *Wis. Heritages v. Harris*, 476 F. Supp. 300, 303 (E.D. Wis. 1979) (ordering no bond) *League of Wilderness Defs. v. Zielinski*, 187 F. Supp. 2d 1263, 1272 (D. Or. 2002) (ordering no bond); *Colo. Wild v. U.S. Forest Serv.*, 299 F. Supp. 2d 1184, 1191 (D. Colo. 2004) (ordering no bond); *Save Strawberry Canyon v. Dep't of Energy*, 613 F. Supp. 2d 1177, 1191 (N.D. Cal. 2009) (ordering no bond); *Baxley v. U.S. Army Corps of Eng'rs*, 411 F. Supp. 1261, 1276 (D. Ala. 1976) (ordering $1 bond); *Sierra Club v. Block*, 614 F. Supp. 488, 494 (D.D.C. 1985) (ordering $20 bond).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system. Parties may access this filing through the court's system.

Respectfully submitted,

*/s/ William S. Eubanks II*
William S. Eubanks II
Eubanks & Associates, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(970) 703-6060
bill@eubankslegal.com