**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

MONROE COUNTY BOARD OF              )
COMMISSIONERS,                      )
INDIANA FOREST ALLIANCE INC,        )
HOOSIER ENVIRONMENTAL COUNCIL,      )
FRIENDS OF LAKE MONROE,             )
                                    )
            Plaintiffs,             )
                                    )
      v.                            )        Case No. 4:23-cv-00012-TWP-KMB
                                    )
UNITED STATES FOREST SERVICE,       )
MICHAEL CHAVEAS,                    )
CHRISTOPHER THORNTON,               )
                                    )
            Defendants.             )

**ORDER GRANTING  PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

This matter is before the Court on Plaintiffs Monroe County Board of Commissioners,

Indiana Forest Alliance, Hoosier Environmental Council, and Friends of Lake Monroe's

(collectively, "Plaintiffs") Motion for a Preliminary Injunction ("Motion") pursuant to Federal

Rule of Civil Procedure 65 ([Filing No. 20](#)). Because the Defendant United States Forest Service

(the "Forest Service")[1] is scheduled to move forward with project implementation on April 1, 2023,

and Plaintiffs do not view that time frame as sufficient for the parties to fully present their case on

the merits or for the Court to render a fully informed merits decision, Plaintiffs seek to enjoin the

Forest Service from implementing the Houston South Vegetation Management and Restoration

Project (the "Project").[2] Plaintiffs contend the Forest Service's decision to prepare a Supplemental

---

[1] This is the Court's second review of the Project. This case is a companion to Cause No. 4:20-cv-00106-TWP-DML and styled *Monroe Cnty. Comm'rs v. U.S. Forest Serv.*, which is currently on appeal to the Seventh Circuit Court of Appeals, appeal docket No. 22-2039 ([Filing No. 8](#)).

[2] The Project "consists of commercial logging, road building and trail improvements, herbicide application, and prescribed burning in the Hoosier National Forest, which is the only National Forest within the state of Indiana."

Information Report ("SIR") rather than an Environmental Impact Statement ("EIS") or an Environmental Assessment ("EA") was arbitrary and capricious and, as such, violates the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701-06 ([Filing No. 20](#)).  Plaintiffs have demonstrated that they are likely to succeed on the merits of their claim, and have made the other showings necessary to be entitled to a preliminary injunction.  For the reasons set forth below, preliminary injunctive relief is **granted**.

## I.  FINDINGS OF FACTS

These background facts are not intended to provide a comprehensive explanation of all the facts presented in this complex case or the administrative record; rather, it provides the background relevant to the issues before the Court.

### A.  The First Case

On May 13, 2020, the Plaintiffs[3] sued the Forest Service[4] alleging violations of the NEPA, the National Forest Management Act, and the APA.[5] Plaintiffs later amended their Complaint to add an Endangered Species Act claim[6] and then the parties filed Cross-Motions for Summary Judgment.[7] On March 30, 2022, the Court granted in part and denied in part the parties' Cross-Motions for Summary Judgment (the "SJ Order").[8] The Court found in favor of the Forest Service

---

([Filing No. 1 at 2](#).) The three activities planned for this year that Plaintiffs seek to enjoin include low intensity prescribed burning, spot herbicide treatment, and limited commercial timber harvest ([Filing No. 23 at 20](#)).

[3] The plaintiffs also included the Monroe County Environmental Commission and Dr. Paul David Simcox.

[4] The defendants also included the United States Fish & Wildlife Service, Michael Chaveas, Michelle Paduani, David Bernhart, and Aurelia Skipwith.

[5] *See* Cause No. 4:20-cv-00106 at [Filing No. 1](#).
[6] *Id*. at [Filing No. 26](#).
[7] *Id*. at Filing No. 33; Filing No. 35.
[8] *See Monroe Cnty. Comm'rs v. U.S. Forest Serv.*, 595 F. Supp. 3d 713, 726 (S.D. Ind. 2022).

on all asserted claims except for Plaintiffs' NEPA claim.[9] The Court determined that the Forest Service had "failed to evaluate the potential impact of the Houston South Project on Lake Monroe (the "Lake")."[10] The Court noted that "[t]he problem with Defendants' EA is that it failed to adequately consider or discuss the legitimate concerns the Houston South Project could have on the Lake."[11]

In particular, the Court stated: "While Defendants' EA does discuss the possibility of sedimentation to the South Fork Salt Creek and the use of best practices to reduce negative impacts, there is no mention of the present concerns regarding Lake Monroe's water or how the Houston South Project may exacerbate these problems."[12] Given that "Lake Monroe is the sole source of drinking water for 120,000 people in southern Indiana," and "the number of comments and concerns that were raised during the scoping process regarding Lake Monroe," the Court expected that the Forest Service would have provided a "convincing statement of reasons" explaining why the impact to Lake Monroe would not be significant."[13] As a result, the Court remanded Plaintiffs' claim that the Forest Service failed to "fully evaluate the environmental effects to Lake Monroe," so that the Forest Service "for analysis consistent with federal law."[14]

Soon thereafter, the Plaintiffs appealed the Court's SJ Order to the Seventh Circuit Court of Appeals (Filing No. 8). This appeal remains pending before the appellate court.

**B.     The Supplemental Information Report**

In the backdrop of the pending appeal and in an attempt to bring the Project in compliance with the Court's SJ Order, on October 6, 2022, the Forest Service prepared a draft SIR to evaluate

---

[9] *Id*. at 723.
[10] *Id*.
[11] *Id*. at 723
[12] *Id*. at 723-24.
[13] *Id*.
[14] *Id*. at 726.

the environmental effects of the Project to the Lake and to consider new information from the February 2022 Lake Monroe Watershed Management Plan (Filing No. 20-1).[15] Plaintiffs and other interested parties submitted comments challenging the draft SIR's analysis and assertions. *Id.* at 21-27. On December 5, 2022, the Forest Service issued a final SIR (Filing No. 23-2 at 2-44). According to the Forest Service, "[b]ecause of the time sensitive nature of the project and the risks that come with our inability to appropriately manage the forest in this area, we are proceeding with this Supplemental Information Report (SIR) with the intent to begin implementation." *Id.* at 28. The final SIR "intends to clarify relevant portions of the existing project record and to add additional information, analysis, and context responsive to the Court's ruling." *Id.* at 5. According to the final SIR,

> [t]he mitigation actions described in this document, as well as in the Environmental Assessment and Specialist Reports, which are incorporated to protect water quality in these watersheds have been shown to be highly effective in protecting water quality and exceed those recommended by the Lake Monroe Watershed Management plan, giving us a high level of confidence that the implementation of the actions in the Houston South Restoration Project will not negatively impact the water quality of approximately 120,000 people who rely on the lake for their drinking water.

*Id.* at 27.

## C.   **This Lawsuit**

On January 25, 2023, the Plaintiffs initiated this related action against the Forest Service alleging the final SIR violated the NEPA, APA, and this Court's SJ Order. (Filing No. 1). Plaintiffs filed the instant Motion (Filing No. 20) seeking vacatur and to enjoin the Forest Service from taking any action to implement the Project and requests that the Court remand the claim once more to the Forest Service for further analysis consistent with federal law. *Id.* Of immediate concern to

---

[15] The Forest Service accepted public comment for 30 days (Filing No. 20-1 at 21-22). Plaintiffs requested an extension of the 30-day comment period to provide sufficient time to review and comment on the draft SIR, but the Forest Service summarily denied those requests. *Id.*

the Plaintiffs is the burn scheduled to begin on or about April 1, 2023. The Project authorizes prescribed fire on up to 13,000 acres over the [10-15 year] lifetime of the Project. This calendar year, the Forest plans three prescribed burns on 3,500 acres in the Project area. The burns and acreages are Lincoln-Back Combs (2,145 acres), Squirrel Town (1,040 acres), and Winkler (316 acres). The Forest plans to begin the prescribed fire treatments on April 1, 2023, as conditions allow. In order to achieve the desired objectives for each burn, individual burn plans are developed. (Filing No. 23-3 at 4-5.)

Plaintiffs move for a preliminary injunction to enjoin Defendants—i.e., the U.S. Forest Service and officials of that agency—from taking any action to implement the Houston South Vegetation Management and Restoration Project in the Hoosier National Forest. This project entails substantial burning, logging, herbicide application, and road building in thousands of acres of Indiana's only national forest, including in important wildlife habitat and recreation areas. These activities will occur on highly erodible, steep slopes that will drain project-related pollutants into Lake Monroe—the sole drinking water source for nearly 150,000 Hoosiers—thereby significantly exacerbating degradation of these waters and threatening public health, safety, and recreational interests in the Lake Monroe watershed. (Filing No. 20).

## II.  CONCLUSIONS OF LAW

Plaintiffs argue the Forest Service violated the NEPA, its implementing regulations, and the APA by preparing an SIR, instead of an EA or an EIS, in response to the Court's SJ Order and by failing to fully respond to public comments prior to finalizing the SIR. The Forest Service contends the Plaintiffs cannot carry its burden of demonstrating entitlement to a preliminary injunction and, as such, the Motion should be denied. Alternatively, if the Court were to determine that an injunction is appropriate, Plaintiffs should be required to post a bond in the amount of

5

$115,906.00. Plaintiffs contend they will likely succeed on the merits, that they will likely suffer irreparable harm, that the balance of equities tips in their favor, that there is no adequate legal remedy, that an injunction is in the public's interest, and that the Court should not require a bond but, if it were to require a bond, that the bond be a nominal amount.

A.   **Legal Standard**

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). "The purpose of such an injunction is to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Faheem-El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988). To obtain a preliminary injunction, the plaintiff has the burden of establishing that (1) he is likely to succeed on the merits of his claim; (2) he has no adequate remedy at law; and (3) he is likely to suffer irreparable harm without the injunction. *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012). If the movant establishes each of these elements, the court then must weigh two additional factors: the balance of harms and the effect of the injunction on the public interest. *Id*. The balance of harms requires further weighing of the harm to the plaintiff if preliminary injunctive relief is erroneously denied versus the harm to the defendant if the injunction is erroneously granted. *Id*.

Courts in the Seventh Circuit employ a sliding scale approach where the greater the likelihood of success, the less harm the moving party needs to show to obtain an injunction, and vice versa. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.,* 549 F.3d 1079, 1086 (7th Cir. 2008).

B.     **The Administrative Procedure Act**

The APA provides the standard of review for Plaintiffs' challenge of the Forest Service's December 5, 2022, Final SIR. *See Highway J Citizens Group v. Mineta*, 349 F.3d 938, 952 (7th Cir. 2003) (reviewing NEPA claim pursuant to APA). In a suit under the APA, a district court sits as a reviewing court, much like an appellate court. *Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 443-44 (7th Cir. 1990). With few exceptions not relevant here, the court does not take new evidence or hold a trial or evidentiary hearing. *Id*. Instead, in reviewing the agency action, the court considers only matters within the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). Under the APA, a court may set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). This standard of review is narrow and requires that the court "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Highway J Citizens Group*, 349 F.3d at 952-53. Thus, if

> an agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise[,]

the agency action must be set aside. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court may not substitute its judgment regarding the environmental consequences of an action for that of the agency. *Highway J Citizens Group*, 349 F.3d at 953. However, the Court must ensure "that the agency has taken a 'hard look' at environmental consequences." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976).

**C.**     **The National Environmental Policy Act of 1969**

The controlling statute at issue here, NEPA, "declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). It has been described as a 'procedural' or 'action-forcing' statute that does not 'mandate particular results' but instead requires agencies to study and describe the environmental consequences of their proposed actions. *Id.* at 348–51; *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Defense Council*, 435 U.S. 519, 558 (1978). Thus, under NEPA, if an agency has adequately identified and evaluated the environmental effects of its proposed action, it is permitted to take that action even if the environmental effects will be devastating. *Robertson*, 490 U.S. at 350. Put differently, "NEPA merely prohibits uninformed—rather than unwise—agency action." *Id.* at 351.

One process required under NEPA is that all federal agencies must prepare a detailed statement reviewing the environmental impacts of the proposed action and alternatives to that action. 42 U.S.C. § 4332(2)(C); *see also Heartwood, Inc. v. United States Forest Serv.*, 230 F.3d 947, 949 (7th Cir. 2000). This statement is referred to as an environmental impact statement, or EIS, and it constitutes a "NEPA document." *Center for Biological Diversity v. U.S. Forest Service*, 444 F.Supp.3d 832, 857 (S.D. Ohio 2020). The EIS is "a detailed analysis and study conducted to determine if, or the extent to which, a particular agency action will impact the environment." *Highway J Citizens Group*, 349 F.3d at 953. Requiring an agency to prepare an EIS serves NEPA's action-forcing purpose in two respects. *Robertson*, 490 U.S. at 349. First, "[i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Id.*

Second, it "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision making process and the implementation of that decision." *Id*. Thus, in the EIS, the agency must "articulate why [it has] settled upon a particular plan and what environmental harms (or benefits) [its] choice entails." *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 666 (7th Cir.1997). The EIS must show that agency officials have "[thought] through the consequences of—and alternatives to—their contemplated acts," and must ensure that "citizens get a chance to hear and consider the rationales the officials offer." *Id*.

In evaluating whether an EIS is necessary, Council on Environmental Quality ("CEQ") regulations instruct that the term "significantly" in the statute requires consideration of both "context" and "intensity." 40 C.F.R. § 1508.27(a)-(b). Context requires the significance of an action be analyzed from different perspectives, including "society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a). Intensity relates to "the severity of the impact" and requires consideration of ten factors, including but not limited to, "the degree to which the proposed action affects public health and safety," "the degree to which the effects on the quality of the human environment are likely to be highly controversial", and "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." *Id*. § 1508.27(b)(1)-(1).

These considerations are often spelled out in the preliminary stages of a proposed project in an EA. An EA is a shorter, rough-cut, low-budget EIS which is mandated when proposed action is neither one normally requiring an EIS nor one categorically excluded from the EIS process. See 40 C.F.R. § 1508.9; 23 C.F.R. § 771.115(c); *Indiana Forest Alliance, Inc. v. United States Forest Serv.*, 325 F.3d 851, 856 (7th Cir. 2003). Among other information, it "provide[s] evidence and analysis that establish[es] whether or not an EIS or a Finding of No Significant Impact ("FONSI")

should be prepared." 40 C.F.R. § 1508.9(a)(1); *see also Rhodes v. Johnson*, 153 F.3d 785, 788 (7th Cir. 1998).

Another mechanism by which agencies determine whether additional NEPA analysis is required is through Supplemental Information Reports or SIRs. Tellingly, SIRs are not mentioned in NEPA or in the regulations implementing NEPA promulgated by the CEQ. *See, e.g.*, 40 C.F.R. § 1508.10 (defining the term "environmental document" as including an EA, an EIS, FONSI, and Notices of Intent). A SIR is not as detailed or thorough as an Impact Statement and the agency need not subject it to public comment. *Clearwater v. Dombeck*, 222 F.3d 552, 555 (9th Cir. 2000). Courts nonetheless have upheld SIRs for the purposes of determining whether new information or changed circumstances required the preparation of a supplemental EA or EIS. *Center for Biological Diversity v. U.S. Forest Service*, 444 F.Supp.3d 832, 857 (S.D. Ohio 2020) (citing *Idaho Sporting Cong., Inc. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000)). However, if an agency determines that an action or new information is significant, a SIR does not suffice—and a supplemental EA or EIS must be prepared. *Id*.

### 1.     Whether Plaintiffs are Likely to Succussed on the Merits

Plaintiffs contend that the SIR is inadequate considering the Court's SJ Order found that the Forest Service's initial EA was deficient and, as such, the Forest Service was required to prepare a supplemental EA or EIS. Plaintiffs claim this case fits squarely within *Idaho Sporting Cong. v. Alexander*, 222 F.3d 562, 566-67 (9th Cir. 2000) ([Filing No. 20-1 at 30-31](#)). The Court agrees.

While the Seventh Circuit made clear that a moving party is not required to show that it will definitely win the case in order to obtain injunctive relief, the moving party must make at least a "strong" showing. *Ill. Republican Party v. Pritzker*, 973 F.3d at 760, 762-63 (7th Cir. 2020)

(citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)). A "strong" showing "normally includes a demonstration of how the applicant proposes to prove key elements of its case."). *Id*. at 763.

In *Idaho*, the Ninth Circuit concluded that the Forest Service's use of a SIR was an improper vehicle to present "information and analysis that it was required, but according to the finding of the district court, failed to include in its original NEPA documents." 222 F.3d at 566-67. In *Idaho*, the Forest Service initially issued EAs and EISs for timber sales which was later found to be deficient under the NEPA. *Id*. at 564-65. The Forest Service later prepared SIRs for the challenged projects and concluded there was "no need to correct, supplement, or revise the environmental document or the Forest Service's decision." *Id*. at 564. Following issuance of the SIRs, Idaho sought to enjoin the sales. *Id*. at 564–65. The district court denied the injunction motion, and, on appeal, the Ninth Circuit found that the Forest Service was not using SIRs for the sole purpose of evaluating new information or changed circumstances but was using the SIRS to present information and analysis that it was required to include in its original NEPA documents. *Id*. at 566–67. It further determined that the SIRs were not prepared early enough to "serve practically as an important contribution to the decision making process and could not be used to rationalize or justify a decision already made." *Id*. at 567. As such, the Ninth Circuit found that the SIRs were deficient under the NEPA.

Here, the procedural posture and facts are closely analogous to the situation in *Idaho*. The Forest Service prepared an EA that was subsequently held invalid by this Court's SJ Order. The Forest Service attempted to cure the then deficient EA by preparing a SIR which concluded that the analysis prepared under the EA was in fact consistent with its prior findings and, therefore, the Project would proceed without any supplemental NEPA document.

This is not a case where the Forest Service is faced with new significant information or changed circumstances. Instead, the Forest Service is using the SIR to present information and analysis that it was required, but according to the SJ Order, failed to include in its initial NEPA document. The Forest Service knew or should have known that it needed to provide this information and analysis at the time it prepared the original EAs and EISs. Nor is this case analogous to any situation where courts have upheld the use of SIRs or a similar non-NEPA environmental evaluation procedure. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 383–85 (1989) (upholding Army Corps' use of SIR to analyze significance of new reports regarding a dam project); *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1218–19 (10th Cir. 1997) (upholding use of SIR to evaluate significance of new survey area of land to be logged); *Laguna Greenbelt, Inc. v. United States Dep't of Transp.*, 42 F.3d 517, 529–30 (9th Cir. 1994) (affirming use of "Memorandum of Record" to evaluate significance of wildfires in project area).

Forest Service argues that *Northwoods Wilderness Recovery, Inc. v. U.S. Department of Agriculture*, 192 Fed. App'x 369 (6th Cir. 2006) and *Friends of Bow v. Thompson*, 124 F.3d 1210, 1216 (10th Cir. 1997) are instructive on this point (Filing No. 23 at 15-16). The Court is not persuaded by either case. As Plaintiffs correctly points out, the question in *Northwoods* centered around "whether new information regarding timber harvest levels post-dating the operative EIS warranted changes to the agency's future timber sale." (Filing No. 24 at 11.) The court there did not find the underlying EIS defective. Similarly in *Bow*, the Tenth Circuit upheld the use of a SIR that focused exclusively on changed circumstances and new information. The SIR there was not issued to repair any deficiency from the underlying EA and, as such, the EA remained in effect.

While the Court's SJ Order did not direct the Forest Service to conduct a particular type of analysis, the Forest Service was still required to comply with the NEPA. The law compels this

Court to give considerable deference to agency decision making, particularly when the decisions involve complex scientific expertise. Were this merely a question of science, this decision would likely favor the Forest Service. But the type of deficiency here is a procedural one. NEPA is a procedural statute and "agency action taken without observance of the procedure required by law will be set aside." *Idaho*, 222 F.3d at 567. The Forest Service failed to take the requisite 'hard look' at the environmental consequences of the Project because it prepared a SIR rather that an EA or EIS as required under the NEPA and its implementing regulations. Plaintiffs have made a "strong" showing that the decision to forgo a Supplemental NEPA document in light of the SJ Order was arbitrary and capricious.

### 1.     Irreparable Harm and Adequate Legal Remedy

In addition to showing a likelihood of success on the merits, Plaintiffs must show that they are likely to suffer irreparable harm without a preliminary injunction. Forest Service argues "Plaintiffs' speculative concerns about the prescribed burns and other activities fail to show irreparable harm is likely, let alone imminent." (Filing No. 23 at 28-29). Forest Service contends the Plaintiffs cannot trace Lake Monroe's water quality problems to Forest Service action because unregulated forestry practices – like those allowed by Monroe County but not the Forest Service's well-designed and robustly monitored projects – contribute to sedimentation. *Id*. at 29. Forest Service contends the Plaintiffs cannot show imminent, irreparable harm because Lake Monroe's water quality problems cannot be traced to the Forest Service's planned activities. *Id*. Forest Service argues "[t]here is no credible evidence in the record that Forest Service actions on federal land in the Project area have or will contribute to the water quality problems in Lake Monroe." *Id*. at 31. In support of its position, Forest Service proffers the Declaration of Fish Biologist Chad Menke. (Filing No. 23-4). Mr. Menke explains that Forest Service BMPs are effective at protecting

and preserving water quality, and Prescribed fires on the Hoosier National Forest are low intensity and will not impact Lake Monroe's water quality. *Id*. at 13. The Forest Service argues against irreparable harm because only low intensity prescribed burns are scheduled to take place in the immediate future, and these burns benefit the forest ecosystem.  The Forest Service points out that the "herbicide application, will take place in late summer, and the timber harvest component, ground disturbing activities are not expected to begin until mid-October. Forest Service contends there is ample time for the parties to brief, and the Court to consider, cross-motions for summary judgment before those this phase of the Project begins." (Filing No. 23 at 10). So there is not imminent, irreparable injury at this time. *Id*.

For their part, Plaintiffs have submitted three detailed declarations identifying with specificity how the Project will irreversibly harm Plaintiffs' longstanding interests in Lake Monroe's water quality, public health, and safety, as well as their interests in wildlife habitat, solitude, and recreational activities in the Hoosier National Forest and Lake Monroe. (Filing No. 20-5, Filing No. 20-7, Filing No. 20-10.)  Based in part on these declarations, Plaintiff's contend that imminent, irreparable harms to the Hoosier National Forrest's wildlife, recreational, water quality, public health, and safety interest in Lake Monroe and affected parcels are likely to occur absent an injunction.

Plaintiffs dispute the Forest Services' position that irreparable harm is not imminent because the Court could resolve this case at summary judgment prior to October 2023, when the Forest Service expects logging to begin. Plaintiffs argue that Forest Services overlooks its extensive allegations regarding irreparable harm related to the April 2023 prescribed burns that are imminent by any metric, but it also asks the Court to suspend disbelief about the timeline for a NEPA case. Plaintiff's point out that the prior case took roughly two years despite expedited

summary judgment briefing, and it did not involve pre-merits disputes that are common in APA cases such as challenges to the adequacy of the administrative record. While Plaintiffs are committed to a prompt resolution of this matter, they note that "if the prior litigation over this Project is any guide, it will be nearly impossible for the parties to brief summary judgment and for the Court to resolve the case before logging commences in October." (Filing No. 20 at 24).

The possibility that adequate compensatory or other corrective relief will be available at a later date ... weighs heavily against a claim of irreparable harm." *Shaffer v. Globe Prot., Inc.*, 721 F.2d 1121, 1124–25 (7th Cir. 1983) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). However, in cases involving environmental injury, legal remedies are usually inadequate. *See U.S. Envtl. Prot. Agency v. Envtl. Waste Control, Inc.*, 917 F.2d 327, 332 (7th Cir. 1990) (noting that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages"). Here, the potential harm relates to the destruction of ecosystems and habitats, and simply awarding damages cannot repair fragile ecosystems that are harmed or change the water quality once impacted. *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545, (1987) ("[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable."); see also *Milwaukee Inner-City Congregations Allied for Hope v. Gottlieb*, 944 F. Supp. 2d 656 (E.D. Wis. 2013) (recognizing that "NEPA plaintiffs are likely to suffer irreparable harm when an agency is allowed to commit itself to a project before it has fully complied with NEPA," even if no actual construction would take place."). The Plaintiffs point out that "in the absence of an injunction, the Forest Service will commence widescale prescribed burns in April 2023 in some of the most remote, pristine forested habitat in Indiana". (Filing No. 20-1 at 8-9). While it may be true that certain portions of the Project are not set to move forward until Fall 2023, the Court is persuaded that irreparable harm is

sufficiently likely to occur when considering the risks posed by the Project to the environment and the impact it may have on the health and safety of Indiana's citizens. Also, considering that the potential harms cannot be remedied by money damages and equitable nature of the NEPA, the Court finds that traditional legal remedies would be inadequate.

### 2. <u>Balancing Equities and Public Interest</u>

Having found that the Plaintiffs will suffer irreparable harm in the absence of an injunction and that they have a likelihood of success on the merits, the Court must proceed to the balancing phase, during which the Court balance the harm the Plaintiffs would suffer in the absence of an injunction against the harm that the Forest Service would suffer if an injunction were granted. The Court must also consider where the public interest lies. Both sides argue that the balance of equities and the public interest weigh in their favor ([Filing No. 20-1 at 39-41](#); [Filing No. 23 at 36-40](#)). When an environmental injury is alleged, "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Gambell*, 480 U.S. at 545. Here, the Court finds that the balance of equities tips in Plaintiffs' favor.

Under the Seventh Circuit's "sliding scale approach," the less likely a claimant is to win, the more that the "balance of harms [must] weigh in his favor." *Valencia v. City of Springfield, Ill.*, 883 F.3d 959, 966 (7th Cir. 2018). The Plaintiffs contend the balance of equities is in their favor because of the alleged environmental harms that will result if the Project proceeds without further evaluation (Filing No 20; [Filing No. 24](#)). They argue

> the Forest Service has no legitimate equitable argument for needing to commence this Project prior to a ruling on the merits of the case. Indeed, the Forest Service waited *14 years* from its issuance of the 2006 Forest Plan to authorize this Project, thereby undercutting any argument that this Project is so urgently needed that it cannot await merits resolution.

([Filing No. 20-1 at 40](#)) (emphasis in original).

In support of their contention that the balance of equities and public interest favors allowing the Project to proceed, the Forest Service argues that other organizations and members of the public support the Project, and but forest health is unquestionably in the public interest. "Since Plaintiffs launched their first lawsuit, aerial surveys have documented new, visible oak decline on nearly 10% of the forested land within the Project area. Further delay for Plaintiffs' preferred (but not legally required) paperwork likely will result in further deterioration of the forest ecosystem." (Filing No. 23 at 10).  The Forest Service also points to the lost revenue and economic value associated with the Project, which may be lost if the injunction is granted (Filing No. 23). While an injunction could delay the Project and might increase its cost, in deciding whether to issue an injunction, the Court must balance this potential delay and potential increased cost against the harm that Plaintiffs would suffer in the absence of an injunction. The Court must also consider the fact that the Plaintiffs did not file their Motion until approximately three years after initiating the first case.

While the Forest Service's potential economic losses are certainly to be weighed in the balancing of hardships, it is not sufficient to override not only the harm to Plaintiffs but the potential harm to the thousands of citizens that consume water from the Lake absent full compliance with NEPA. Courts have consistently held that the public has an interest in having Congress' mandates in NEPA carried out accurately and completely. *See Siskiyou Regional Educ. Proj. v. Goodman*, No. 04-cv-3058, 2004 WL 1737738, at *13 (D. Or. Aug. 3, 2004) (enjoining logging and finding that "the public interest is not served if the project goes forward in violation of" environmental laws).

 Further, Plaintiffs have not been sitting on their hands the entire three years prior to filing this Motion. In fact, Plaintiffs have been vigorously litigating this matter against the Forest Service

since 2020. As explained, Plaintiffs' alleged injury is imminent and irreparable. Moreover, the Court is not persuaded that the economic impact that the Forest Service would face due to any delay created by complying with NEPA tips the balance against granting injunctive relief. As to the public interest, Congress's determination in enacting NEPA was that the public interest requires careful consideration of environmental impacts before major federal projects may go forward. Suspending the Project until that consideration has occurred thus comports with the public interest. Consistent with that guidance, the Court concludes that the public interest favors an injunction in this case.

### 3.  **Bond**

The Forest Service contends the Plaintiffs should be required to post a bond in the amount of $115,906.00 to cover direct financial damages if it cannot proceed with the Project and is later found to be wrongfully enjoined (Filing No. 23 at 40-43). Plaintiffs argue they should not be required to pay a bond but, if they are required, then the bond amount should be no more than $10,000.00, because the Forest Service has not demonstrated that the alleged "economic harms were reasonably incurred or are likely to be incurred." (Filing No. 24 at 26.) Plaintiffs also point out that this case includes not only nonprofit organizations but also a county government that collects and spends taxpayer dollars on critical health, safety, and infrastructure projects. Thus, if required to post a bond, Monroe County's share of the bond will only further harm the county's residents because "[t]he costs of government are borne ultimately by taxpayers." *Habitat Education Center. v. U.S. Forest Service*, 607 F.3d 453 (7th Cir. 2010), (Filing No. 25 at 28).

Under Federal Rule of Civil Procedure 65(c), a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R.

Civ. P. 65(c). "The purpose of an injunction bond is to protect the restrained party from damages that it would incur in the event that the injunction was wrongfully issued." *Bader v. Wernert*, 178 F. Supp. 3d 703, 745 (N.D. Ind. 2016). The district judge has the discretion to determine what amount of security, if any, is appropriate. *Wayne Chemical, Inc. v. Columbus Agency Service Corp.*, 567 F.2d 692, 701 (7th Cir. 1977); *Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972). "[W]hen setting the amount of security, district courts should err on the high side." *Habitat Educ. Ctr. at* 456 (7th Cir. 2010) (quoting *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir.), *opinion amended on denial of reh'g*, 209 F.3d 1032 (7th Cir. 2000)).

Nevertheless, some district courts have waived the bond requirement where the court was satisfied that there is no danger that the "opposing party will incur damages from the injunction." *Id.* at 458. In other cases, courts have reduced the requested bond amounts because it exceeded the movant's ability to pay, and courts balanced "the relative cost to the opponent of a smaller bond against the cost to the applicant of having to do without a preliminary injunction that he may need desperately." *Id.* (collecting cases).

Here, the Court will not waive the bond requirement, but it will reduce the requested amount. In support of its bond request, the Forest Service put forth an affidavit from Christopher Thornton, an employee, with the Forest Service. (Filing No. 23-3 at 2-22.) The Forest Service estimates that it will lose $31,668.00 related to two proposed timber sales, approximately $4,238.00 related to planning and preparing the fire lines, and approximately 80,000.00 in appropriated funds that, if not used, may not be available next year. *Id.* at ¶¶ 38-41. The Forest Service argues that Plaintiffs have substantial assets and, as such, they should be required to pay the full bond amount (Filing No. 23 at 42-43). Plaintiffs have not challenged the Forest Service's representation of Plaintiffs' financial condition, including their assets and liabilities (Filing No.

24). While the Seventh Circuit in *Habitat* expressly rejected the argument that nonprofit entities should be exempt from having to post injunction bonds, the bond amount there was $10,000.00, compared to the $115,906.00 bond sought here.

The Court has received evidence to support a finding that the Forest Service will likely suffer damages associated with the timber sales and preparing the fire lines (Filing No. 23-3 at 2-22). However, The Court is not persuaded that the appropriated funds will not be available next year and, as such, the potential harm is less likely. If the appropriated funds are not available next year, (and the injunction is still in place) the Forest Service may petition the Court to increase the bond amount. *See Contra Mead Johnson & Co. v. Abbott Laboratories*, 201 F.3d 1032, 1034 (7th Cir. 2000) (finding that where appropriate, courts may increase the bond amount while the preliminary injunction is in effect). Therefore, at this stage, the Court will require Plaintiffs to post a nominal bond in the amount of $11,596.00.

### III.   <u>ORDER</u>

A preliminary injunction is an extraordinary remedy never awarded as of right.  In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 20.  Based on the record before it, the Court finds that Plaintiffs have carried their burden of demonstrating a likelihood of success on the merits, imminent, irreparable harm, lack of adequate legal remedies, and that the balance of equities and public interest favor granting a preliminary injunction. Accordingly:

1. Plaintiffs' Motion for a Preliminary Injunction (Filing No. 20) is **GRANTED.**  Pursuant to Federal Rule of Civil Procedure 65(d), the Court **ISSUES A PRELIMINARY INJUNCTION** prohibiting the Forest Service from implementing the Houston South

Vegetation Management and Restoration Project burn set to commence on April 1, 2023.

The Court **ORDERS** the Forest Service to halt all activities related to the Project until it

can make a showing sufficient to pass muster under the NEAP and the APA.

2. Plaintiffs shall post a bond in the amount of $11,596.00.

        **SO ORDERED.**

Date:   3/29/2023

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

William S. Eubanks II
EUBANKS & ASSOCIATES, LLC
bill@eubankslegal.com

W. Russell Sipes
THE SIPES LAW FIRM
wrs@sipeslawfirm.com

Matthew Ryan Arnold
EUBANKS & ASSOCIATES, PLLC
matt@eubankslegal.com

John Tustin
DOJ-Enrd
john.tustin@usdoj.gov

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
shelese.woods@usdoj.gov